908 A.2d 1220

**Robert L. EHRLICH, Jr., Governor, et al.**

**v.**

**Flor PEREZ, et al.**

No. 137, Sept. Term, 2005.

Court of Appeals of Maryland.

Oct. 12, 2006.

692

694

Margaret Ann Nolan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD, Steven M. Sullivan and Joel Tornari, Asst. Attys. Gen., on brief), Baltimore, MD, for Appellants.

Hannah Lieberman (Regan Bailey of Legal Aid Bureau, Inc, Riverdale, MD, on brief); Douglas M. Bregman (Heather Libman Kafetz and Catherine Harrington of Bregman, Berbert, Schwartz & Gilday, L.L.C., Bethesda, MD; Dan Friedman of Saul Ewing, L.L.P., Baltimore, MD, all on brief), for Appellees.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

Pursuant to Maryland Code (1973, Repl. Vol. 2002), Courts and Judicial Proceedings Article, § 12–303(3)(i),[1] Appellants (Defendants below), the Honorable Robert L. Ehrlich, Jr., the Honorable S. Anthony McCann, and the Honorable Nancy Kopp, each sued in his or her official capacity as Governor of Maryland, Secretary of the Maryland Department of Health and Mental Hygiene ("DHMH"), and State Treasurer, respectively, sought appellate review of a preliminary injunction issued by the Circuit Court for Montgomery County. The injunction essentially ordered the payment of medical assistance benefits to Appellees (Plaintiffs in the Circuit Court), comprised of Flor Perez and Ana Perez (minors, by their father and next friend, Fidel Perez); Brayan Herrera, Osvaldo Herrera, and Leslie Herrera (minors, by their mother and next friend, Martha Herrera); and Gabriel Ntitebem, Henry Anu, and Vitalis Atemafac (minors, by their mother and next friend, Ajong Pamela Nkahinjo),[2] under the Medical Assis-

---

1. Maryland Code (1973, Repl. Vol. 2002), Courts and Judicial Proceedings Article, § 12–303(3)(i) provides that a party may appeal from an interlocutory order entered by a circuit court that "[g]rant[s] or dissolv[es] an injunction, but if the appeal is from an order granting an injunction," then the order may be appealed "only if the appellant has first filed his answer in the cause[.]"

2. A First Amended Complaint filed in the Circuit Court on 21 December 2005 (the day of the scheduled hearing for the request for a preliminary

tance Program, Maryland Code (1982, Repl. Vol. 2005), Health–General Article, § 15–103.[3]

Appellees, all residents of Maryland, are lawful permanent resident aliens of the United States who immigrated from their respective foreign countries on or after 4 August 2003. Section 15–103(a)(2)(viii) provides that the State

> [s]hall provide, subject to the limitations of the State budget and any other requirements imposed by the State, comprehensive medical care and other health care services for all legal immigrant children under the age of 18 years and pregnant women who meet Program eligibility standards and who arrived in the United States on or after August 22, 1996, the effective date of the federal Personal Responsibility and Work Opportunity Reconciliation Act [8 U.S.C. § 1601, *et. seq.* (1996) (hereinafter "PRWORA").]

The Circuit Court granted the preliminary injunction based, in part, upon its conclusion that Appellees likely would prevail on their claim that the failure of the State of Maryland to appropriate funds for Fiscal Year ("FY") 2006 (1 July 2005 through 30 June 2006) for medical benefits, as provided under § 15–103(a)(2)(viii), to resident alien children and resident alien pregnant women in Maryland who immigrated to the United States on or after 22 August 1996, while funding similar benefits to citizens and resident aliens in Maryland who immigrated lawfully before 22 August 1996, violated

---

injunction) sought to add several new plaintiffs, including Jhonny Francis Guerrel, Yoharis Francis Tamayo, and Ydalis Francis Tamayo (minors, by their father and next friend, Yohara Tamayo Ruiz), and Eelaaf Zahid and Muhammad Loulak Zahid (minors, by their father and next friend, Muhammad Zahid Iqbal). In its 12 January 2006 memorandum opinion and order granting the preliminary injunction, the Circuit Court stated that, in deciding whether to issue a preliminary injunction, it "viewed the case in light of the facts as set forth in the original Complaint."

**3.** Maryland Code (1982, Repl.Vol.2005), Health–General Article, § 15–103 outlines the administration of the Medical Assistance Program. All statutory references in this opinion are to the Health–General Article unless otherwise specified.

Article 24 of the Maryland Declaration of Rights.[4] Appellants filed a timely appeal with the Court of Special Appeals. We issued, on our initiative, a writ of certiorari to the Court of Special Appeals, *Ehrlich v. Perez*, 391 Md. 577, 894 A.2d 545 (2006), before our colleagues on the intermediate appellate court could decide the merits of the case, in order to consider:[5]

1. Whether Appellants violated Article 24 of the Maryland Declaration of Rights by not appropriating monies for the State-funded Medical Assistance Program to resident alien children and pregnant women who immigrated to the United States on or after 22 August 1996 (a group not otherwise covered under federal analogous law—Medicaid) where federal law, enacted under the authority held by the Federal Government over national immigration policy, expressly provides the States with complete discretion to provide wholly State-funded medical benefits to this class of legal resident aliens.

2. Whether the Circuit Court was authorized to order, through a preliminary injunction, Appellants to reinstate medical benefits to Appellees, as prescribed under the Medical Assistance Program, both retrospectively from 26 October 2005, the date the original Complaint and Motion for Preliminary Injunction were filed, back to 1 July 2005 and prospectively from 26 October 2005 until final disposition of the case.

I.

In its written memorandum opinion explaining why it issued the preliminary injunction, the Circuit Court summarized the

---

4. Article 24 of the Maryland Declaration of Rights provides "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

5. We have re-written the questions for our consideration for clarity.

relevant factual and legislative background as follows, in pertinent part:

\* \* \*

## FACTUAL BACKGROUND

■ Based solely on the original Complaint filed on October 26, 2005, the Plaintiffs are comprised of Flor Perez and Ana Perez (by their father and next friend, Fidel Perez); Brayan Herrera, Osyaldo Herrera, and Leslie Herrera (by their mother and next friend, Martha Herrera); and Gabriel Ntitebem, Henry Anu, and Vitalis Aternafac (by their mother and next friend, Ajong Pamela Nkahinjo). They have filed their original Complaint against the Defendants, who are comprised of the Governor (Robert L. Ehrlich, Jr.), the Secretary of the Department of Health and Mental Hygiene (S. Anthony McCann), and the Treasurer (Nancy Kopp) for one count of Violation of Maryland Declaration of Rights. On the day of the scheduled hearing for the Request for a Preliminary Injunction, the Plaintiffs filed an Amended Complaint, identifying five additional Plaintiffs. However, for purposes of this Preliminary Injunction, the Court viewed the case in light of the facts as set forth in the original Complaint.

Generally, the Plaintiffs' Complaint alleges that the State of Maryland, through Governor Ehrlich's budgetary authority, discriminated and otherwise unconstitutionally denied certain persons living in the State access to health care [under § 15–103, called the Medical Assistance Program]. The Plaintiffs[ ] further contend that the State relied upon the classification of "alienage" in making their decision to deny health care coverage of these individuals.

On April 7, 2005, the General Assembly enacted the fiscal year 2006 Budget. In mid-June, the Department of Health and Mental Hygiene mailed a notice to all resident alien recipients, including the Plaintiffs named herein, to inform them that their current benefits would end starting June 30, 2005 as a result of the Governor's decision to eliminate such funding. The notice provided for a right to appeal the

termination of coverage to the Office of Administrative Hearings (OAH).[6] The notice also informed the recipients that there were alternative options for publicly subsidized health care coverage. Specifically, the recipients were advised to apply to their local health department for Maryland Children's Health Program (MCHP) coverage if they are under 19 years of age. The Department also notified the local health departments in each jurisdiction that funding for this coverage group had been eliminated from the fiscal year 2006 Budget and thereby instructed the local departments to assist persons in this group with finding similar care wherever possible.

Despite the Department's efforts, Plaintiffs, and others similarly situated, have been precluded as a result of their own indigence. Coupled with their inability to pay, most of these programs are unable to provide such necessary services that were previously covered under the Medical Assistance Program. Often times these alternative programs are simply closed to new patients.

---

**6.** Neither the trial court nor the parties explicated the origin of this apparent opportunity to litigate an administrative appeal of Appellants' action. *See Furnitureland v. Comptroller,* 364 Md. 126, 132, 771 A.2d 1061, 1065 (2001) (noting that any court may raise *sua sponte* the issue of invocation and exhaustion of administrative remedies). While Appellees note in a footnote of their brief that one of the persons who sought to join the case as a Plaintiff in the First Amended Complaint filed in the Circuit Court did pursue an administrative appeal, we could find nothing else in the record transmitted in the present litigation to suggest such an administrative appeal was pursued by any of the Appellees named in the original complaint. Even if an opportunity for an administrative remedy existed, judicial consideration of the present action would not be barred by the doctrine of exhaustion of administrative remedies because the "constitutional exception" to the general rule applies in the present case. *See Montgomery County v. Broadcast,* 360 Md. 438, 455–60, 758 A.2d 995, 1004–07 (2000) (outlining the development and contours of the "constitutional exception"). This "constitutional exception" permits an aggrieved litigant to proceed immediately to court to seek a declaratory judgment or equitable remedy, regardless of the existence of an available administrative appeal, where the sole contention raised in the court action is based on a facial attack on the constitutionality of the governmental action. *See, e.g., PSC v. Wilson,* 389 Md. 27, 91, 882 A.2d 849, 887 (2005).

### LEGISLATIVE BACKGROUND

In order to thoroughly understand the issues at hand, it is imperative that this Court outline the Federal and State statutory programs upon which the Plaintiffs previously relied for their health care services.

### A. FEDERAL PROGRAMS

#### i. Medicaid

Medicaid is a federal program established by Title XIX of the Social Security Act. *See* 42 U.S.C. §§ 1396–1396v. "Congress has authorized grants to states for the purpose of enabling each state, as far as practicable under the conditions in such state, to furnish medical assistance to persons who are eligible thereof." 81 C.J.S. Social Security and Public Welfare § 247. Eligible individuals include certain indigent persons, such as the "aged," "blind" and "disabled." Medicaid also provides coverage for pregnant women and children who fall below a certain income threshold, in addition to covering medically needy persons, such as elderly persons who are confined to nursing homes and whose medical expenses have exhausted their other assets. If a state chooses to take part in the federal Medicaid program, it must comply with the requirements set forth in Title XIX and its implementing regulations in order to receive federal matching funds. In Maryland, the federal matching fund is about 50% of the total expenditures. *See* Federal Matching Shares for Medicaid, 68 Fed. Reg. 67676 (Dec. 3, 2003).

#### ii. Federal Welfare Reform Act

On August 22, 1996, Congress enacted legislation that significantly impacted Medicaid coverage for select individuals residing in the U.S. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, generally know as the "Welfare Reform Act," was a program designed to further the national immigration policy of "self-sufficiency." 8 U.S.C. § 1601(1). The statement of national policy concerning welfare and immigration reads, in part: "It is a compelling government interest to remove the incentive for

illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6).

The Act ultimately rendered non-qualified aliens ineligible for Federal Medicaid benefits, while also creating two categories for qualified aliens. *Ali[e]ssa v. Novello,* 96 N.Y.2d 418, 426[, 730 N.Y.S.2d 1], 754 N.E.2d 1085 (2001); *see also* 8 U.S.C. § 1613. The language states: "An alien who is a qualified alien (as defined in section 1641 of this title) and who enters the United States on or after August 22, 1996, is not eligible for any Federal means-tested public benefit for a period of 5 years beginning on the date of the alien's entry into the United States with a status within the meaning of the term 'qualified alien.'" 8 U.S.C. 1613(a). Among the provisions of the Welfare Reform Act was the elimination of all benefits for illegal immigrants and other "non-qualified aliens," with a few limited exceptions such as emergency medical care. 8 U.S.C. § 1613. In doing so, Congress divided the two qualified alien categories into two subcategories: (1) qualified aliens who have resided in the U.S. since a time prior to August 22, 1996. *Id.* Some states were required to provide funding to the first subcategory of qualified aliens. *Id.* However, a period of five years residency in the U.S. was required for the second subcategory. *Id.* Congress then authorized the States to enact any law *after* August 22, 1996, should they choose to compensate this newly designated class of ineligible aliens, provided they use only State funds.

## B. MARYLAND STATE PROGRAMS

### i. *Maryland's Welfare Innovation Act*

"State participation in Medicaid is voluntary, but if a state participates, it must comply with the federal statutes and regulations governing the programs. However, there is no legal prohibition preventing a state legislature from awarding medical assistance benefits on its own, independent of federal reimbursement." 81 C.J.S. Social Security and Public Welfare § 247; *see also San Lazaro Ass'n, Inc. v. Connell,* 286 F.3d 1088 (9th Cir.2002), *cert. denied,* 537 U.S. 878, 123 S.Ct. 78, 154 L.Ed.2d 133 (2002); *Westside Mothers*

*v. Haveman,* 289 F.3d 852, 2002 [Fed.] FED App. 0172P
(6th Cir.2002), *cert. denied,* 537 U.S. 1045, 123 S.Ct. 618, 154
L.Ed.2d 516 (2002). In 1997, the Maryland General Assem-
bly enacted Chapter 593, the "Welfare Innovation Act,"
adding Health–General Article § 15–103(a)(2)(viii) to the
Maryland Annotated Code. This addition thereby authorized
the state to provide:

> "[s]ubject to the limitations in the State budget and any
> other requirements imposed by the State, comprehensive
> medical care and other health care services for all legal
> immigrant children under the age of 18 years and preg-
> nant women who meet Program eligibility standards and
> who arrived in the U.S. on or after August 22, 1996, the
> effective date of the federal Personal Responsibility and
> Work Opportunity Reconciliation Act."

Md. Ann. Code, Health–General Article § 15–103(a)(2)(viii).
The [statutory provision] provides for medical assistance to
this newly excluded class of alien, pregnant women and
children deemed ineligible for non-emergency, Federal
Medicaid benefits. Although the Maryland State Medicaid
program, along with federal matching funds, provides the
same medical services as available under the Welfare Inno-
vation Act to both citizens and resident aliens who meet the
five-year residency requirement, this new provision is limit-
ed to those aliens for whom federal Medicaid eligibility was
eliminated by the Welfare Reform Act. Therefore, it is
funded entirely with state funds. Here, the State used the
authority granted by Congress under the Welfare Reform
Act. [The benefits established by the adoption of § 15–103]
became known as the Medical Assistance Program.

C. THE MARYLAND STATE BUDGET

\* \* \*

Every year in Maryland, the Governor submits a proposed
budget bill to the General Assembly containing the pro-
posed budgetary measures for the State government for the
following fiscal year. Unlike a "give and take" relationship
between the Legislative and Executive branches . . ., the
General Assembly is free to reduce the Governor's budget-

ary proposals, but it may *not* increase or amend. *See* MD Const., Art. 3, § 52(6).

Except as expressly mandated by the Constitution or statutes, the Governor has complete discretion over the inclusion of appropriations in the Budget and the amount for the executive branch. The constitutional mandates relate to funding the public schools, redemption of the State debt, the payment of certain salaries. With the consent of the General Assembly, the Governor can amend or supplement the Budget Bill prior to its passage. Subject to certain exceptions and limitations, the General Assembly has express power only to strike or reduce appropriations in the Budget Bill. However, this express power includes the implied power to condition or qualify.

Richard E. Israel, Archives of Maryland Online, "Maryland's Budget Process," [ ] www.mdarchives.state.md.us/megafile/msa/speccol/sc2900/sc2908/html/budget.html (last visited December 29, 2005). Despite its ability to "condition" or "qualify" the revisions in the proposed Budget, the General Assembly is precluded from deciding that a particular appropriation is under funded. Maryland's Legislative branch is powerless to realign the Governor's proposed spending like[, for example,] the legislatures in New York and Virginia.

*iv. The Fiscal Year 2006 Maryland Budget: The "Carve–Out" Provision*

Recently, the fiscal year 2006 Budget as proposed by the Governor eliminated funding for the Medical Assistance Program. This budget cut essentially carved the aforementioned category of legal, resident aliens out of the State's final Budget Bill. There are currently no funds available in the budget for the women, who were not pregnant, and children, both who were in this program at the beginning of the current fiscal year—however, [§ 15–103] remains in force. Despite their ability to condition or qualify certain budgetary measures, the Maryland General Assembly never had the option to restore funding to the program, as this

would have resulted in the General Assembly overstepping its Constitutional boundaries[.] [7]

On 12 January 2006, the Circuit Court issued a written memorandum opinion and order granting Appellees' Motion for Preliminary Injunction. In its opinion, the Circuit Court explained its view that Appellees satisfied the four requisite elements for issuance of a preliminary injunction. Specifically, the trial court determined that: the balance of convenience clearly favored Appellees because they suffered great harm as a result of the State's budget cut; Appellees were irreparably injured as a result of the State's action because they were unable to afford health care without the unfunded State assistance; the public interest "is best served if the [State is] required to provide benefits to [Appellees] for which they are currently entitled [under § 15–103(a)(2)(viii)];" and, finally, Appellees demonstrated that they likely would succeed on the merits of their Article 24 equal protection claim. It is this latter determination to which most of the parties' attentions are directed on appeal.

With regard to the likelihood of success on the merits, the Circuit Court explored the principles of equal protection under Article 24. While acknowledging that Appellees are "appropriately classified as 'aliens,'" the court determined that the allegations pertained to the denial of Appellees' equal protection right "based on their status as individuals who are legally entitled to State funding [under § 15–103(a)(2)(viii)]—not as a suspect class." [8] Thus, rather than focusing upon the "'alien-

---

**7.** We note that it appears that the General Assembly, had it chosen to do so, could have restored funding to the program by adopting a Supplemental Appropriation Bill for that purpose. *See* Constitution of Maryland, Article III, § 52(8).

**8.** Although the court expressed the view that "alienage is not a suspect class," it later relied upon *Nyquist v. Mauclet*, 432 U.S. 1, 7, 97 S.Ct. 2120, 2124, 53 L.Ed.2d 63, 69 (1977) (recognizing that "classifications by a State that are based on alienage are 'inherently suspect and subject to close judicial scrutiny'"), to conclude that "because the only individuals affected were legal resident aliens, the State's *actions* are deemed 'suspect,' and accordingly are subject to a higher standard of review."

age' classification" to determine the appropriate standard of review to apply to the State action, the court looked to the "Governor's decision to cut funding to a legally entitled group of individuals...." Recognizing that, in considering equal protection challenges, a rational basis standard of review generally applies to examining State action with regard to economic and social welfare issues, the Circuit Court determined that the "impact on [Appellees] ... is far too disparate to ignore 'alienage' as an underlying classification...." Therefore, the court reviewed the constitutional claim as to the budget cut under a strict scrutiny standard. The court then concluded that the State failed to advance a sufficient basis "as to how [its] budgetary interest was compelling enough to overcome strict scrutiny." The court noted that "cutting welfare funds to legally entitled individuals is certainly not narrowly tailored enough to overcome strict scrutiny." Consequently, the Circuit Court reasoned that the State failed to meet its burden and determined that Appellees likely would succeed on the merits of their equal protection claim.

The Circuit Court ordered "that the benefits payable under the Health–General Article § 15–301, *et seq.* previously denied to [Appellees] be ... retroactively reinstated" and further ordered "that the benefits payable under the Health–General Article § 15–301, *et seq.* be ... reinstated until final disposition of this action." Appellants filed with the Circuit Court a Notice of Appeal to the Court of Special Appeals, an Answer, and a Motion for Stay Pending Appeal on 19 January 2006. Appellees filed an opposition on 23 January 2006. That same day, the Circuit Court issued a separate order staying the part of the preliminary injunction that ordered payment of retrospective benefits, but denied a stay in all other respects.

The Court of Special Appeals issued an order on 7 February 2006 staying the judgments entered on the Circuit Court's orders, pending appeal, without prejudice to the right of any

---

In a footnote, the trial court stated that "[t]he use of the word 'suspect' only refers to the Government's actions, and [is] not meant to designate 'alienage' as a new 'suspect class.'"

current Appellee, at that time, to seek from the Circuit Court "appropriate limited relief from the stay upon a full and complete showing that (1) in order to avoid a serious risk to his or her health, the Appellee must receive particularized medical treatment prior to April 7, 2006, (2) the Appellee would have coverage for this treatment if the Orders of the circuit court had not been stayed by this Order, and (3) the Appellee will not be provided with necessary treatment unless the circuit court grants appropriate relief."

After Appellants' brief on the merits was filed in the intermediate appellate court, but before further action could be taken by that court, we issued a writ of certiorari to the Court of Special Appeals on 9 March 2006. *Ehrlich,* 391 Md. at 577, 894 A.2d at 545.

## II.

### General Standards Applicable to the Review of the Grant of Injunctive Relief

"Our review of a preliminary injunction is limited because we do not now finally determine the merits of the parties' arguments." *LeJeune v. Coin Acceptors, Inc.,* 381 Md. 288, 300, 849 A.2d 451, 458 (2004) (citing *Department of Transportation v. Armacost,* 299 Md. 392, 404, 474 A.2d 191, 197 (1984)) (Internal quotations omitted). We review only whether the trial court properly granted the preliminary injunction. *Fogle v. H & G Restaurant,* 337 Md. 441, 456, 654 A.2d 449, 455 (1995); *see also State Dep't v. Baltimore County,* 281 Md. 548, 550, 383 A.2d 51, 53 (1977) (stating that "it is a rare instance in which a trial court's discretionary decision to grant or to deny a preliminary injunction will be disturbed by this Court"). In reviewing a trial court's decision to issue a preliminary injunction, we "determine whether the trial judge exercised sound discretion in examining the four factors that must be found . . . ." *LeJeune,* 381 Md. at 300, 849 A.2d at 458 (citing *Lerner v. Lerner,* 306 Md. 771, 776, 511 A.2d 501, 504 (1986)). The four factors that the trial judge examines when

considering the appropriateness of granting a preliminary injunction include:

> (1) the likelihood that the plaintiff will succeed on the merits; (2) the "balance of convenience" determined by whether greater injury would be done to the defendant by granting the injunction than would result from its refusal;[ ] (3) whether the plaintiff will suffer irreparable injury unless the injunction is granted; and (4) the public interest.

*Armacost,* 299 Md. at 404–05, 474 A.2d at 197 (citing *State Dep't v. Baltimore County,* 281 Md. at 554–57, 383 A.2d at 55). The party seeking the preliminary injunction has the burden of adducing facts necessary to satisfy these factors. *Fogle,* 337 Md. at 456, 654 A.2d at 456. The "failure to prove the existence of even one of the four factors" precludes the grant of injunctive relief. *Id.* With regard to the factor of the likelihood of success on the merits, "the party seeking the interlocutory injunction must establish that it has a real *probability* of prevailing on the merits, not merely a remote *possibility* of doing so." *Id.*

 Yet, "even with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards." *LeJeune,* 381 Md. at 301, 849 A.2d at 459 (Citation omitted). We review *de novo* a trial judge's decision involving a purely legal question. *Matthews v. Maryland-National Capital Park & Planning Com'n,* 368 Md. 71, 92, 792 A.2d 288, 301 (2002). We apply the more deferential abuse of discretion standard to a trial judge's ruling involving a balancing of interests. *Id.* In the present case, the Circuit Court's determination of the likelihood of success on the merits is a question of law. *See Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 80 (2004) (noting that because "interpretation of the Maryland Declaration of Rights and Constitution ... [is] appropriately classified as [a] question[ ] of law, we review the issue[ ] *de novo*"). Consequently, we apply the *de novo* standard to that factor, but the more deferential abuse of discretion standard to the trial judge's determinations as to the remaining three factors.

## III.

## The Parties' Main Arguments

## A.

## Level of Judicial Scrutiny to be Accorded to the Appellants' Action in the Equal Protection Analysis

Appellants assert that the Circuit Court erred in granting the preliminary injunction because Appellees lacked a real probability of prevailing on the merits of their Article 24 claim. Appellants contend that their failure to appropriate funds for medical benefits to a subcategory of legal aliens who, by virtue of congressional action under PRWORA, were ineligible to receive federal medical benefits is subject to rational basis review under the Supremacy Clause and withstands Appellees' equal protection challenge under that standard. Under the Supremacy Clause, Appellants contend, consideration of Appellees' state constitutional claim requires judicial deference to Congress' plenary power over naturalization and immigration policy. Relying on *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), and *Fiallo v. Bell,* 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), Appellants argue that Congress' power over the admission and naturalization of aliens is complete and broad such that Congress' actions are subject to narrow judicial scrutiny.

Although conceding that the State may not exercise independently a like power over aliens, Appellants maintain that, in adopting the Welfare Reform Act, Congress prescribed a uniform rule for the treatment of an alien sub-class in regard to the provision of medical benefits, which Maryland could follow, citing as support *Plyler v. Doe,* 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786, 800 n. 19 (1982), *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982), *DeCanas v. Bica,* 424 U.S. 351, 358 n. 6, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), and *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). It is necessary to apply this relaxed standard of scrutiny to both federal and state laws that follow a federal classification because "[i]t

would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution compels the states to refrain from adhering to the federal guidelines [when a state denies state-funded welfare benefits to certain aliens]," quoting *Sudomir v. McMahon*, 767 F.2d 1456, 1466 (9th Cir.1985) (applying rational basis review in rejecting equal protection challenge to the State's denial of State-funded welfare benefits to a sub-class of aliens).

Appellants offer that the reason for the Maryland budget cut was to achieve a cost savings of seven million dollars (equal to the amount of funds appropriated in the Medical Assistance Program in Fiscal Year ("FY") 2005, inclusive of the estimated number of individuals of the legal alien sub-class to which Appellees belong) of the four billion dollar budget appropriated for medical assistance health care costs generally. They maintain that Congress provided a "sufficient showing of a facially legitimate and bona fide reason" to discriminate against the relevant alien sub-class in the provision of federal Medicaid benefits, by including legislative findings in the Welfare Reform Act. These legislative findings provide that the provisions of the Welfare Reform Act were necessary to achieve the national immigration policy of encouraging self-sufficiency and removing incentives for illegal immigration. The Act's findings also provide that a State choosing not to provide non-emergency medical benefits to aliens excluded from federal benefits by the Welfare Reform Act, as Maryland did in the FY 2006 Budget, "shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy," quoting 8 U.S.C. § 1601(7). Appellants argue that the Supremacy Clause restrains Maryland State courts from disregarding Congress' direction in this area of immigration policy.

Finally, as to the correct standard of review to be applied to the Article 24 challenge, Appellants assert that the Welfare Reform Act grants Maryland the ability to determine whether and to what extent it will use State funds to provide non-

emergency medical benefits to resident aliens who do not meet the five-year residency requirement, see 8 U.S.C. §§ 1622(a), 1624(a), provided that any prohibitions, limitations, or restrictions imposed by Maryland are not more restrictive than the prohibitions, limitations, or restrictions imposed under comparable federal programs, see 8 U.S.C § 1624(b).[9]

Appellees, on the other hand, maintain (as Appellants seem to concede) that the budget cut of State-funded medical assistance to certain resident aliens was a classification based upon alienage, and is therefore a suspect classification, relying on *Murphy v. Edmonds*, 325 Md. 342, 601 A.2d 102 (1992), and *Graham, supra*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534. Appellees argue that, because Appellants used a classification based on alienage in cutting State-funded medical assistance to the relevant sub-class of legal aliens depending on their length of residency in the United States, a court reviewing the State action must apply the strict scrutiny standard, see, e.g., *Graham*, 403 U.S. at 370–76, 91 S.Ct. at 1851–54, 29 L.Ed.2d at 540–44, *Nyquist v. Mauclet*, 432 U.S. 1, 8, 97 S.Ct. 2120, 2125, 53 L.Ed.2d 63, 70 (1977), and *Takahashi v. Fish & Game Comm'n.*, 334 U.S. 410, 418–22, 68 S.Ct. 1138, 1142–44, 92 L.Ed. 1478, 1486–89 (1948). Appellees and Appellants agree that if Congress prescribed a truly uniform rule or standards for the treatment of aliens and a State abided by that rule or applied properly those standards when it chose to discriminate against or between resident aliens within its territory, a reviewing court should apply a rational basis scrutiny to determine whether the State action violated equal protection rights. The parties part ways thereafter. Appellees assert

---

9. Appellants supplementally contend that Maryland courts recognize that the deference afforded to the State under rational basis analysis is especially appropriate in reviewing equal protection challenges to public welfare programs, citing *United Wire, Metal and Machine Health and Welfare Fund v. State of Maryland Deposit Insurance Fund Corporation*, 307 Md. 148, 159, 512 A.2d 1047, 1052–53 (1986), and *Callahan v. Department of Health and Mental Hygiene*, 69 Md.App. 316, 517 A.2d 781 (1986). We note that *United Wire* and *Callahan* are distinguishable from the present case because the alleged discrimination in the present case, as we shall hold, is directed at a suspect class.

that PRWORA provides no uniform rule or evaluative standards with regard to decisions involving State-funded medical assistance programs because PRWORA leaves unbridled discretion to the individual States to decide how each will treat the class of resident aliens that immigrated to the United States on or after 22 August 1996 and therefore have not resided in the United States for five years. Thus, Appellees argue that the appropriate standard of review of the State action here is strict scrutiny. Furthermore, Appellees contend that Appellants' reason for the budget cut (cost savings) is not a sufficiently compelling state interest to justify its discrimination against an alien sub-class when fashioning its medical assistance plan budget, citing, e.g., *Graham*, 403 U.S. at 374, 91 S.Ct. at 1853–54, 29 L.Ed.2d at 543 ("[A] State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify ... making noncitizens ineligible for public assistance benefits ... and restricting benefits to citizens and longtime resident aliens."), and *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

Appellees bring to our attention that a similar medical assistance funding restriction adopted in New York, based on alienage, was found to be unconstitutional, under state and federal equal protection guarantees, in *Aliessa v. Novello*, 96 N.Y.2d 418, 730 N.Y.S.2d 1, 754 N.E.2d 1085 (2001). The Court of Appeals of New York in *Aliessa* concluded that, in contrast to the federal government, States may only discriminate against immigrants in State-funded programs if the federal government has prescribed by uniform rule what it believes to be appropriate standards for the treatment of an alien sub-class, citing language from footnote 19 in *Plyler v. Doe*. *Aliessa*, 754 N.E.2d at 1096 (discussing *Graham*). The court concluded that, by enacting PRWORA, Congress did not establish a uniform rule for States regarding the provision of medical assistance to legal immigrants because Congress left to the States' discretion the development of their own individualized policies regarding the provision of State-funded medical assistance to legal immigrants. *Aliessa*, 754 N.E.2d at 1098. Because New York's termination of State-funded bene-

fits to resident aliens was not pursuant to a uniform federal rule or set of criteria, our sister high court reviewed the State action under the strict scrutiny test, concluded that it did not pass that review, and held that the State action violated the Equal Protection guarantees of the federal and New York constitutions. *Id.* The legal reasoning applied by the court in *Aliessa* applies, it is submitted by Appellees, with equal force to the present case.

## B.

### Judicial Action Possibly Implicating State Budget Appropriations Limitations

Appellants claim that the Circuit Court lacked the authority to issue a preliminary injunction requiring expenditure of State funds to pay for medical benefits that were not appropriated in the FY 2006 Budget. Appellants' argument is based on the contention that Maryland law does not permit constitutional and statutory requirements governing public expenditures to be overborne by a violation of Article 24 of the Declaration of Rights.

Appellants characterize the Circuit Court's order as an illegal order for the expenditure of unappropriated funds, in contravention of Article III, § 32 of the Maryland Constitution (which provides that State funds must be appropriated through the comprehensive executive budget procedure pursuant to Article III, § 52); *see also Md. Act. for Foster Child. v. State*, 279 Md. 133, 148, 367 A.2d 491, 499 (1977); *Judy v. Schaefer*, 331 Md. 239, 250, 627 A.2d 1039, 1044–45 (1993); *Dorsey v. Petrott*, 178 Md. 230, 242, 13 A.2d 630, 636 (1940); *Philip Morris v. Glendening*, 349 Md. 660, 681, 709 A.2d 1230, 1240 (1998). Maryland Code (1985, Repl. Vol. 2006), State Finance and Procurement Article, §§ 7–205, 7–234(a) and (c) likewise prohibits the expenditure of State funds not appropriated properly by law and provides for the removal of any State officer or employee who violates that prohibition.

Appellants contend that the Circuit Court's "departure from the requirements of the Constitution" in granting the prelimi-

nary injunction is not justified by a likely equal protection violation under Article 24 because the Maryland Declaration of Rights would not trump the express demands of the Constitution. Rather, Appellants posit that if there exists a conflict between Article 24 and the specific provisions of the Maryland Constitution governing budget and appropriations requirements, then the specific provisions prevail, relying on *Commission on Medical Discipline v. Stillman*, 291 Md. 390, 410–11, 435 A.2d 747, 757–58 (1981), and *Broadwater v. State*, 306 Md. 597, 602 n. 2, 510 A.2d 583, 585 n. 2 (1986). By expressly providing that the prohibition against unappropriated expenditures applies to "any order," Article III, § 32 forecloses the possibility that the constitutional provisions establishing budget and appropriations requirements may be suspended or evaded by the expedient of a court order.

Characterizing the Circuit Court's preliminary injunction order as an appropriation of funds from the State Treasury, Appellants maintain that the constitutional prerequisites for a lawful expenditure of State funds are not satisfied here and that there has been no appropriation for the benefits that the preliminary injunction orders be paid. Thus, Appellants argue, the payment of funds may not be ordered or made from the State Treasury to satisfy the preliminary injunction.

Appellees counter that the Circuit Court possessed the authority to fashion the preliminary injunction as it did. First, Appellees assert that the Governor's budgetary authority, although far-reaching, is subject to fundamental constitutional limitations, including Article 24. This Court can give both Article 24 of the Declaration of Rights and Article III, §§ 52 and 32 of the Maryland Constitution full effect, as part of an integrated document, by requiring the Executive not to violate the Declaration of Rights in the course of exercising his budgetary authority, a reading that Appellees posit is required by both the history of the Budget Amendment and its subsequent interpretations by this Court. Appellees also contend that Article III, § 32 pertains to legislative orders, not judicial orders, relying on *Dorsey, supra*, 178 Md. at 237, 13 A.2d at

634, and PHILIP B. PERLMAN DEBATES OF THE MARYLAND CONSTI-
TUTIONAL CONVENTION OF 1867.

The Circuit Court did not order the direct expenditure of
specific funds; rather the injunctive order "was designed to
remedy a constitutional violation and protect [Appellees] from
irreparable harm, while leaving the mechanism for rectifying
the constitutional violation entirely up to Appellants." Appel-
lees argue that because the Budget Bill provides for a lump
sum appropriation, of which some small portion is restricted
for specific purposes (for example, the FY 2005 budget provid-
ed for a total of approximately $4 billion for medical care
provider costs, of which some portion is used for medical
assistance), the general language of the appropriation leaves
significant leeway to the DHMH to move funds within broad
categorical appropriations in order to satisfy the court's order.
Appellees also highlight that, in recent years, when the State's
medical assistance expenditures exceeded budget projections,
Appellants did not deny coverage to eligible recipients, but
instead, routinely included in the annual Budget Bill amounts
to cover the prior year's deficiency.

### IV.

We consider first whether the failure to fund as to
Appellees (and the sub-class of legal aliens of which they are a
part) the Medical Assistance Program for FY 2006, i.e., the
budget cut, violates the principles of equal protection embod-
ied in Article 24 of the Maryland Declaration of Rights.
Article 24 and the Equal Protection Clause of the Fourteenth
Amendment are in *pari materia*, and we generally apply them
in like manner and to the same extent. *Hornbeck v. Somerset
Co. Bd. of Educ.*, 295 Md. 597, 640, 458 A.2d 758, 781 (1983).
Although the two are capable of divergent application, "[w]e
have, however, long recognized that decisions of the [U.S.]
Supreme Court interpreting the equal protection clause of the
federal constitution are persuasive authority in cases involving
the equal treatment provisions of Article 24." *Id.* (citing
*Attorney General v. Waldron*, 289 Md. 683, 704–05, 426 A.2d
929, 940–41 (1981), and *Bureau of Mines v. George's Creek*,

272 Md. 143, 156, 321 A.2d 748, 755 (1974)). *See also Kirsch v. Prince George's County,* 331 Md. 89, 96–97, 626 A.2d 372, 375–76 (1993); *Murphy v. Edmonds,* 325 Md. 342, 354, 601 A.2d 102, 108 (1992). Consequently, even though Appellees ground their equal protection challenge solely on Article 24, we shall consider the argument in light of both cases interpreting and applying the Equal Protection Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights.

Differing standards have evolved for reviewing classifications challenged under the equal protection guarantees:

In most instances when a governmental classification is attacked on equal protection grounds, the classification is reviewed under the so-called "rational basis" test. Generally under that test, a court " 'will not overturn' " the classification " 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.' " *Gregory v. Ashcroft,* 501 U.S. 452, [471], 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410, 430 (1991), quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171, 176 (1979). *See Pennell v. San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1, 16 (1988). A statutory classification reviewed under the rational basis standard enjoys a strong presumption of constitutionality and will be invalidated only if the classification is clearly arbitrary. *See, e.g., Briscoe v. P.G. Health Dep't,* 323 Md. 439, 448–449, 593 A.2d 1109, 1113–1114 (1991); *Hargrove v. Board of Trustees,* [ ] 310 Md. [406, 423, 529 A.2d 1372, 1380 (1987)]; *State v. Wyand,* [ ] 304 Md. [721, 726–27, 501 A.2d 43, 46 (1985)]; *Whiting-Turner Contract. Co. v. Coupard,* 304 Md. 340, 352, 499 A.2d 178, 185 (1985); *Department of Transportation v. Armacost,* 299 Md. 392, 409, 474 A.2d 191, 199 (1984); *State v. Good Samaritan Hospital,* 299 Md. 310, 328, 473 A.2d 892, 901, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984); *Montgomery Co. v. Fields Road,* 282 Md. 575, 579–580, 386 A.2d 344, 347 (1978).

Where, however, a statutory classification burdens a "suspect class" or impinges upon a "fundamental right," the classification is subject to strict scrutiny. Such statutes will be upheld under the equal protection guarantees only if it is shown that " 'they are suitably tailored to serve a compelling state interest.' " *Broadwater v. State*, 306 Md. 597, 603, 510 A.2d 583, 585 (1986), quoting *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313, 320 (1985). *See, e.g., Graham v. Richardson*, 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534, 541–542 (1971) ("classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny"); *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600, 615 (1969) ("in moving from State to State . . . appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional"); *Kramer v. Union Free School District*, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889–1890, 23 L.Ed.2d 583, 589 (1969) (classification impinging upon the right to vote). *See also O.C. Taxpayers v. Ocean City*, 280 Md. 585, 594, 375 A.2d 541, 547 (1977) ("we are . . . here dealing with the right to vote, and thus the classification is subject to . . . special scrutiny").

Finally, there are classifications which have been subjected to a higher degree of scrutiny than the traditional and deferential rational basis test, but which have not been deemed to involve suspect classes or fundamental rights and thus have not been subjected to the strict scrutiny test. Included among these have been classifications based on gender (*Mississippi University For Women v. Hogan*, 458 U.S. 718, 723, 102 S.Ct. 3331, 3335, 73 L.Ed.2d 1090, 1097 (1982); *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971)),[10] discrimination against illegitimate

10. We stated in a footnote that "[i]n Maryland, because of the Equal Rights Amendment to the Maryland Constitution (Article 46 of the

children under some circumstances (*Weber v. Aetna Casualty & Surety Company,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968)), a classification between children of legal residents and children of illegal aliens with regard to a free public education (*Plyler v. Doe,* 457 U.S. 202, 217–218, 224, 102 S.Ct. 2382, 2395, 2398, 72 L.Ed.2d, 786, 799–800, 803 (1982)), and a classification under which certain persons were denied the right to practice for compensation the profession for which they were qualified and licensed (*Attorney General v. Waldron, supra,* 289 Md. at 716–728, 426 A.2d at 947–954). (Some alterations in original).

*Murphy,* 325 Md. at 355–57, 601 A.2d at 108–09. *See also Kane v. Board of Appeals,* 390 Md. 145, 171 n. 18, 887 A.2d 1060, 1075 n. 18 (2005).

 Classifications based on alienage employed by a State "are inherently suspect and are therefore subject to strict judicial scrutiny whether or not a fundamental right is impaired." *Graham,* 403 U.S. at 376, 91 S.Ct. at 1854, 29 L.Ed.2d at 544. *See also Murphy,* 325 Md. at 356, 601 A.2d at 109; *Nyquist v. Mauclet,* 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (holding that a New York statutory provision barring certain resident aliens from State financial assistance for higher education violated the Equal Protection Clause of the Fourteenth Amendment after applying strict judicial scrutiny and finding that New York failed to offer a compelling governmental interest to justify the discrimination); *Graham,* 403 U.S. at 371–72, 91 S.Ct. at 1852, 29 L.Ed.2d at 541–42 ("[T]he [U.S. Supreme] Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete

---

Maryland Declaration of Rights), classifications based on gender are suspect and subject to strict scrutiny. *State v. Burning Tree Club, Inc.,* 315 Md. 254, 295, 554 A.2d 366, 386, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989)." *Murphy,* 325 Md. 342, 357 n. 7, 601 A.2d 102, 109 n. 7 (1992).

and insular' minority for whom such heightened judicial solicitude is appropriate.") (Footnotes and citations omitted); *Takahashi*, 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478, 1488 (concluding that a California statute violated the equal protection guarantee of the Fourteenth Amendment when it used a federally created racial ineligibility for citizenship as a basis for barring Japanese resident aliens from obtaining commercial fishing licenses, stating that "the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits").[11]

Statutory discrimination within the larger class of legal resident aliens, providing benefits to some aliens, but not to others, is nonetheless a classification based on alienage. *Nyquist*, 432 U.S. at 7–9, 97 S.Ct. at 2124–25, 53 L.Ed.2d at 69–71 (rejecting a claim that a New York statutory provision barring certain resident aliens from State financial assistance for higher education did not impose a classification based on alienage); *Graham*, 403 U.S. at 371, 376, 91 S.Ct. at 1851–52, 1854, 29 L.Ed.2d at 541, 544 (stating that a State statutory classification where otherwise qualified citizens living in a State are entitled to assistance benefits without regard to length of national residency, but aliens must have lived in this country for a number of years in order to qualify for aid, is an inherently suspect classification and is subject to strict scrutiny).[12]

---

11. Legal resident aliens as a group, by sole virtue of their immigration status, are not to be imagined as dole bludgers. Rather, these individuals are contributing members of society in that "[a]liens like citizens pay taxes and may be called into the armed forces." *Graham*, 403 U.S. at 376, 91 S.Ct. at 1854, 29 L.Ed.2d at 544 (Internal quotations and citation omitted).

12. Appellants look to *Soskin v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004), and *Doe v. Commissioner of Transitional Assistance*, 437 Mass. 521, 773 N.E.2d 404 (2002), to support their contention that we should apply a rational basis standard of review to the budget cut at issue in the present case through adoption of a "uniform rule" doctrine that extends to the provision of State medical benefits. We note that these cases do not hold what Appellants claim.

Where a federal statute distinguishes between citizens and aliens (and sub-classes of aliens), the U.S. Supreme Court applies a more relaxed standard of review than the strict scrutiny standard of review applied to comparable State statutes. In *Mathews v. Diaz, supra,* 426 U.S. at 84, 96 S.Ct. at 1889, 48 L.Ed.2d at 492, the Court upheld a federal statute that conditioned an alien's eligibility for participation in a federal medical insurance program on continuous residence in the United States for a five-year period and admission for permanent residence. The Court noted the broad power over naturalization and immigration pursuant to which Congress regularly enacts rules governing aliens. *Mathews,* 426 U.S. at 79–80, 96 S.Ct. at 1891, 48 L.Ed.2d at 489–90. The Court also acknowledged that decisions regarding the relationship between the United States and aliens may implicate our country's relations with foreign powers—an arena more appropriately left to the federal legislative and executive branches of government than to the federal judiciary. *Mathews,* 426 U.S. at 81, 96 S.Ct. at 1892, 48 L.Ed.2d at 490–91. The Court therefore applied a relaxed standard of review to a federal law that distinguished between sub-classes of aliens by conditioning an alien's eligibility for participation in a federal medical

---

In *Doe,* the State supreme court found that a Massachusetts statutory provision barring welfare benefits to certain aliens based on the duration of their State residency was not a classification based on alienage because it distinguished between subgroups of aliens. *Doe,* 773 N.E.2d at 533–34. Consequently, the court in *Doe* applied a rational basis standard of review and upheld the validity of the State law.

Applying a similar rationale, the U.S. Court of Appeals for the Tenth Circuit, in *Soskin,* determined that "[a] state's exercise of the option to include fewer aliens in its aliens-only program [under the provisions of PRWORA] ... should not be treated as discrimination against aliens as compared to citizens. Rather, what the State is doing is discriminating within the aliens-only program against one class of aliens as compared to other classes of aliens." *Soskin,* 353 F.3d at 1255–56. Thus, the court in *Soskin* "follow[ed] the Massachusetts Supreme Judicial Court's *Doe* decision in applying rational-basis review to such distinctions." *Soskin,* 353 F.3d at 1256.

Rather, *Graham* and *Nyquist* make clear that discrimination among sub-classes of resident aliens remains a suspect classification and thus a State's discriminatory action will be subjected to strict judicial scrutiny review.

insurance program on satisfying a five-year national residency requirement and gaining admission for permanent residence requirement. *Id.* Applying this relaxed standard of review (in effect, a rational basis standard of review), the Court concluded that it was reasonable for Congress to make an alien's eligibility for federal medical benefits dependent upon both the character and the duration of his or her residence. *Mathews,* 426 U.S. at 83, 96 S.Ct. at 1893, 48 L.Ed.2d at 492.

Moreover, in *Mathews,* the Court contrasted the federal government's power to enact laws governing aliens to the States' lack of authority to do likewise. The Court noted that its decision in *Graham* supported its decision in *Mathews,* stating that "it is the business of the political branches of the Federal Government, rather than that of either the states or the Federal Judiciary, to regulate the conditions of entry and residence of aliens." *Mathews,* 426 U.S. at 84, 96 S.Ct. at 1893–94, 48 L.Ed.2d at 493. The Court noted also that the equal protection analysis involved in *Graham* had "significantly different considerations" from those in *Mathews* because in *Graham* the Court considered the relationship between aliens and States. *Mathews,* 426 U.S. at 84–85, 96 S.Ct. at 1894, 48 L.Ed.2d at 493. "Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country. Both groups are noncitizens as far as the State's interests in administering its welfare programs are concerned." *Mathews,* 426 U.S. at 85, 96 S.Ct. at 1894, 48 L.Ed.2d at 493 (Footnote omitted).[13]

---

**13.** The Court stated further that "[d]ivision by a State of the category of persons who are not citizens of that State into subcategories of U.S. citizens and aliens has no apparent justification, whereas, a comparable classification by the Federal Government is a routine and normally legitimate part of its business." *Mathews,* 426 U.S. at 85, 96 S.Ct. at 1894, 48 L.Ed.2d at 493.

Regarding discrimination in the treatment of aliens by a State, the Court stated that "whereas the Constitution inhibits every State's power to restrict travel across its own borders, Congress is explicitly empowered to exercise that type of control over travel across the borders of the United States." *Mathews,* 426 U.S. at 85, 96 S.Ct. at 1894, 48 L.Ed.2d

Appellants insist that we should apply a relaxed standard of scrutiny when deciding whether the budget cut undertaken by Appellants violated Article 24 of the Maryland Declaration of Rights, pursuant to the theory of the "uniform rule," because a federal law (PRWORA) expressly grants to States the discretion whether to provide wholly State-funded medical benefits to the class of resident aliens who immigrated to the United States on or after 22 August 1996. Appellees counter by asserting that, because Congress left complete discretion to the States, we should apply the strict scrutiny standard to the State's action because the federal statute did not provide a "uniform rule" to which the States are required to adhere in exercising that discretion. The "uniform rule" foundation for application of a relaxed scrutiny review of State action under equal protection attack has not been adopted previously in a reported Maryland case or U.S. Supreme Court decision.

Analysis of the question of whether the State action here is shielded by the "uniform rule" theory from what otherwise should be a strict scrutiny standard of review does not yield a succinct or ready answer. The U.S. Supreme Court has noted that it has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders." *Toll v. Moreno,* 458 U.S. 1, 10, 102 S.Ct. 2977, 2982, 73 L.Ed.2d 563, 571 (1982) (citing *Mathews,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478, *Graham,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534, *Takahashi,* 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478, *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), and *Truax v. Raich,* 239 U.S. 33, 42, 36 S.Ct. 7, 11, 60 L.Ed. 131 (1915)). In *Takahashi v. Fish &*

at 493 (Footnote omitted). Quoting a portion of the *Graham* decision in a footnote, the Court noted that

"State alien residency requirements that either deny welfare benefits to noncitizens or condition them on longtime residency, equate with the assertion of a right, inconsistent with federal policy, to deny entrance and abode. Since such laws encroach upon exclusive federal power, they are constitutionally impermissible." *Graham v. Richardson,* 403 U.S. 365, 380, 91 S.Ct. at 1848, 29 L.Ed.2d at 534. *Mathews,* 426 U.S. at 85 n. 25, 96 S.Ct. at 1894 n. 25, 48 L.Ed.2d at 493 n. 25.

*Game Commission, supra,* 334 U.S. at 419, 68 S.Ct. at 1142, 92 L.Ed. at 1487, the Court stated that these broad constitutional powers of the federal government include "determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization." (Citation omitted). *See also DeCanas,* 424 U.S. at 355, 96 S.Ct. at 936, 47 L.Ed.2d at 48–49 (stating that regulation of immigration is "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain"). "Federal authority to regulate the status of aliens derives from various sources, including the Federal Government's power 'to establish [a] uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, its power '[t]o regulate Commerce with foreign Nations', *id.,* cl. 3, and its broad authority over foreign affairs, see *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936); *Mathews v. Diaz, supra,* 426 U.S. at 81, n. 17, 96 S.Ct., at 1892, n. 17; *Harisiades v. Shaughnessy,* 342 U.S. 580, 588–589, 72 S.Ct. 512, 518–519, 96 L.Ed. 586 (1952)." *Toll,* 458 U.S. at 10, 102 S.Ct. at 2982, 73 L.Ed.2d at 571 (Alterations in original). *But see DeCanas,* 424 U.S. at 355, 96 S.Ct. at 936, 47 L.Ed.2d at 48 (noting that it "has never held that every state enactment which in any way deals with aliens is a regulation of immigration"). As noted previously in this opinion, courts apply a relaxed standard of review when examining the validity of a *federal* statute that distinguishes between citizens and aliens (and sub-classes of aliens) in the distribution of *federal* medical benefits because Congress is said to possess plenary power to regulate aliens. While it is clear that the federal government possesses authority to regulate national immigration policy, the question of whether and, if so, under what conditions and terms, the federal government may delegate that authority (or any portion of that authority) to the States, such that courts reviewing a resultant State action will apply a relaxed standard of review, is less apparent.

In conjunction with recognition of the exclusive power of the federal government to regulate aliens, the Supreme Court also expressed, on numerous occasions, reservations about Congress delegating that authority to the States. In 1889, the Supreme Court articulated generally those reservations:

> The power of exclusion of foreigners being an incident of sovereignty belonging to the Government of the United States, as a part of those sovereign powers delegated by the Constitution, the right to its exercise at any time when, in the judgment of the Government, the interests of the country require it, cannot be granted away or restrained on behalf of anyone. The powers of Government are delegated in trust to the United States, and are incapable of transfer to any other parties.

*Chae Chan Ping v. United States,* 130 U.S. 581, 609, 9 S.Ct. 623, 631, 32 L.Ed. 1068, 1076 (1889). Later, in *Shapiro v. Thompson, supra,* 394 U.S. at 641, 89 S.Ct. at 1335, 22 L.Ed.2d at 619, the Court articulated more specifically that "Congress may not authorize the States to violate the Equal Protection Clause." The Court noted additionally that

> [p]erhaps Congress could induce wider state participation in school construction if it authorized the use of joint funds for the building of segregated schools. But could it seriously be contended that Congress would be constitutionally justified in such authorization by the need to secure state cooperation? Congress is without power to enlist state cooperation in a joint federal-state program by legislation which authorizes the States to violate the Equal Protection Clause. *Katzenbach v. Morgan,* 384 U.S. 641, 651 n. 10, 86 S.Ct. 1717, 16 L.Ed.2d 828, 836 n. 10 (1966).

*Id.* In *Graham v. Richardson, supra,* 403 U.S. at 382, 91 S.Ct. at 1857, 29 L.Ed.2d at 547–48, citing *Shapiro, supra,* 394 U.S. at 641, 89 S.Ct. at 1335, 22 L.Ed.2d at 619, the Court reemphasized this limitation on the ability of Congress to delegate its authority over regulation of aliens to the States: "Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms

and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *See also Saenz v. Roe*, 526 U.S. 489, 508, 119 S.Ct. 1518, 1529, 143 L.Ed.2d 689, 707 (1999) ("Congress has no affirmative power to authorize the States to violate the Fourteenth Amendment and is implicitly prohibited from passing legislation that purports to validate any such violation.").[14] It is not disputed that the federal government may authorize States to legislate concurrently in subject areas in which it has acted; yet, it is less evident to this Court that the federal government expressly may transfer its authority (and thus justify a relaxed level of scrutiny of the resultant State action) to the States in order to regulate in the area of immigration in a manner that would be permissible if done by the federal government, but unconstitutional if carried out independently by an individual State. *Compare Mathews*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478, *with Graham*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534.

■ Assuming that the power over immigration and naturalization possessed by the federal government includes establishing a single, uniform, and articulated directive for treating aliens regarding State-only funded medical assistance benefits, such that we will employ a rational basis standard of review to a State's elimination of State-only funded benefits for certain resident aliens,[15] we conclude that PRWORA prescribes no

---

**14.** No party in the present action suggests the unconstitutionally of Congress' enactment of PRWORA itself. Thus, we focus our examination on the State's action. In doing so, we nonetheless consider the authority of Congress to authorize the States to, at their discretion, discriminate against aliens in the distribution of State-funded medical assistance benefits.

**15.** We note that there is some basis for limiting the federal government's authority to effectuate national immigration policy to only certain areas, which basis does not include regulating the guidelines used by States when providing solely State-funded medical assistance benefits to aliens. In *Plyler v. Doe*, 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786, 800 n. 19 (1982), the Supreme Court identified three specific areas that are affected by alienage classifications made by the federal government:

uniform rule in any event. Rather, Congress has provided discretion to the States with regard to their decisions whether to provide State-funded medical benefits, on the basis of alienage, to those resident aliens who do not meet the requirements for federal medical assistance. The grant of discretion, without more, is not a uniform rule for purposes of imposing only a rational basis test. The unbridled discretion afforded by Congress prevents us from characterizing the material provisions of PRWORA as "uniform." In suggesting that a "uniform rule" principle exists, the U.S. Supreme Court unhelpfully declared only a one element requirement—that the rule prescribed by Congress be uniform. In *Plyler v. Doe,* 457 U.S. 202, 219 n. 19, 102 S.Ct. 2382, 2396 n. 19, 72 L.Ed.2d 786, 800 n. 19 (1982), the Court explained that although no State independently could exercise a power held by the federal government in the area of immigration, "if the Federal Government has by *uniform* rule prescribed what it believes to be *appropriate standards* for the treatment of an alien sub-class, the States may, of course, follow the federal direction." (Citing *DeCanas,* 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43) (Emphasis added).

---

With respect to the actions of the Federal Government, alienage classifications may be intimately related to the conduct of foreign policy, to the federal prerogative to control access to the United States, and to the plenary federal power to determine who has sufficiently manifested his allegiance to become a citizen of the Nation.

In *Mathews v. Diaz,* 426 U.S. 67, 80, 96 S.Ct. 1883, 1891–92, 48 L.Ed.2d 478, 490 (1976), however, the Court, examining whether the *federal* government could place conditions on aliens' eligibility for *federal* medical benefits, noted that

[t]he decision to share that bounty [welfare benefits] with our guests may take into account the character of the relationship between the alien and this country: Congress may decide that as the alien's tie grows stronger, so does the strength of his claim to an equal share of that munificence.

Also, in *Graham v. Richardson,* 403 U.S. 365, 377, 91 S.Ct. 1848, 1854, 29 L.Ed.2d 534 (1971), the Court stated that "Congress has not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States." This seemingly leaves the door ajar.

As the Court of Appeals of New York noted in *Aliessa v. Novello, supra,* 754 N.E.2d at 1098, "in administering their own programs [under PRWORA], the States are free to discriminate in either direction—producing not uniformity, but potentially wide variation based on localized or idiosyncratic concepts of largesse, economics and politics." *See also Truax,* 239 U.S. at 42, 36 S.Ct. at 11, 60 L.Ed. at 135. This laissez faire federal approach to granting discretionary authority to the States in deciding whether to continue State-funded medical benefits for resident aliens who do not meet the five-year residency duration requirement does not prescribe a single, uniform or comprehensive approach. "If the rule were uniform, each State would carry out the same policy under the mandate of Congress—the only body with authority to set immigration policy." *Aliessa,* 754 N.E.2d at 1098.[16] Thus, a State's decision to eliminate the funding of a State-only funded Medical Assistance Program to a sub-class of lawfully admitted resident aliens who are ineligible for federal medicaid benefits was not carried out in compliance with a single, uniform policy prescribed by the federal government.[17]

Recent decisions from state and federal courts lend support for this conclusion. In *Aliessa,* the Court of Appeals of New York adopted a similar position on the "uniform rule" principle. *Aliessa,* 754 N.E.2d at 1098. The court determined that a provision of the New York Medicaid statute, which denied State-only medical benefits coverage to otherwise eligible per-

---

**16.** An example of the divergence among States acting on maintaining coverage of medical assistance benefits for aliens ineligible for federal Medicaid is seen by the treatment in New York's and Maryland's current coverage. *See Aliessa,* 754 N.E.2d at 1092.

**17.** It matters not to our analysis that Maryland chose to exercise the discretion purportedly accorded by PRWORA in 1996 to continue to extend medical benefits to the relevant sub-class of aliens not covered by federal medical benefits until FY 2006 when it recanted those benefits. The State may not act independently in a discriminatory manner with regard to distributing State-funded medical benefits to lawful resident aliens unless it survives a strict scrutiny standard of review. The purported discretionary authorization of PRWORA does not reduce that standard of review of the State's action.

sons permanently residing in the United States under color of law and lawfully admitted permanent residents based on their status as aliens, violated the Equal Protection Clauses of both the U.S. and New York Constitutions. *Aliessa*, 754 N.E.2d at 1098–99. Under the equal protection challenge,[18] the court first established that State actions based on alienage classifications should be strictly scrutinized. *Aliessa*, 754 N.E.2d at 1094. Noting that the State did not attempt to justify its action under the strict scrutiny standard of review, the court next addressed the State's contention that the State statute "implements [PRWORA's] Federal immigration policy and should therefore be evaluated under the less stringent 'rational basis' standard[ ]" because, the State argued, PRWORA provided a uniform rule which States could choose to follow. *Aliessa*, 754 N.E.2d at 1095.

The New York high court compared State and Congressional authority with regard to immigration and naturalization. *Aliessa*, 754 N.E.2d at 1095–96. Acknowledging the authority of the federal government, and the sources of that authority, with regard to immigration and naturalization issues, the Court stated that "over no conceivable subject is the legislative power of Congress more complete." *Aliessa*, 754 N.E.2d at 1096 (quoting *Oceanic Steam Nav. Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013, 1022 (1909)). Citing *Mathews*, the court noted Congress' ability to distinguish between aliens and citizens when allocating federal welfare benefits. *Id.* The court concluded that "when Federal welfare programs are jointly administered with the States, Congress may direct the States to implement national immigration objectives as long as the 'Federal Government has by *uniform* rule prescribed what it believes to be appropriate standards for the treatment of an alien sub-class.' " *Id.* (quoting *Plyler*, 457 U.S. at 219 n. 19, 102 S.Ct. at 2396 n. 19, 72 L.Ed.2d at 800 n. 19). With regard to "whether

---

18. The Court of Appeals of New York determined also that the relevant provision of the New York Medicaid statute also violated a separate article of its State constitution, which mandates care for the needy. Maryland does not have a similar article in its State constitution.

[PRWORA] can constitutionally authorize New York to determine for itself the extent to which it will discriminate against legal aliens for State Medicaid eligibility," *Id.*, the Court determined it could not because "[PRWORA] does not impose a uniform immigration rule for States to follow." *Aliessa*, 754 N.E.2d at 1098 [19]; *see also Teytelman v. Wing*, 2 Misc.3d 608, 773 N.Y.S.2d 801 (N.Y.Sup.2003).

This uniformity requirement for applying a relaxed scrutiny standard of review to State action in a somewhat similar context also has been noted by the U.S. Court of Appeals for the Ninth Circuit. In *Sudomir v. McMahon*, 767 F.2d 1456 (9th Cir.1985), the Ninth Circuit affirmed the lower court's denial of the plaintiffs' motion for a preliminary injunction. *Sudomir*, 767 F.2d at 1457. The court rejected the challenge that the State's decision not to provide welfare benefits to the plaintiffs, who were aliens that had applied for, but not yet received, political asylum, under a cooperative federal-state assistance program, violated the Equal Protection Clause of the Fourteenth Amendment. *Sudomir*, 767 F.2d at 1457. The court, however, determined that the State's action was constitutional because "Congress ha[d] enacted a *uniform* policy regarding the eligibility of asylum applicants for welfare benefits." *Sudomir*, 767 F.2d at 1466.

The Court in *Sudomir* distinguished its material facts from those in *Plyler* on the basis that the "State [in *Plyler*] had employed the federal classification 'for *its own* discriminatory policy[.]'" *Sudomir*, 767 F.2d at 1466 (quoting *Plyler*, 457 U.S. at 226, 102 S.Ct. at 2399, 72 L.Ed.2d at 805). The court noted also that the outcome in *Plyler* might have been different had "there been an articulable federal policy" and emphasized the following language from *Plyler*: "[b]ut if the Federal

---

**19.** To support its conclusion of requiring uniformity in the federal directive before it will apply relaxed scrutiny to a State action, the Court of Appeals of New York relied upon *Graham, supra,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534, *Plyler, supra,* 457 U.S. at 219 n. 19, 102 S.Ct. at 2396 n. 19, 72 L.Ed.2d at 800 n. 19, *Mathews, supra,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478, and *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976).

Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction." *Sudomir,* 767 F.2d at 1466 (quoting *Plyler,* 457 U.S. at 226, 219 n. 19, 102 S.Ct. at 2399, 2396 n. 19, 72 L.Ed.2d at 805, 800 n. 19). Turning back to its own case, the court concluded that "the [S]tate employed both a federal classification *and* a uniform federal policy regarding the appropriate treatment of a particular sub-class of aliens." *Sudomir,* 767 F.2d at 1466. Specifically, with regard to the uniformity of the federal policy at issue in that case, the court noted that the federal law *required* the denial of benefits to the specified alien sub-class. *Sudomir,* 767 F.2d at 1466.[20] The court, therefore, concluded that the lower court correctly applied the relaxed scrutiny standard to the State law upholding the denial of benefits to asylum applicants. *Sudomir,* 767 F.2d at 1466.[21]

 Because we conclude that PRWORA does not provide a "uniform rule" for subsequent State actions,[22] we shall

---

**20.** Immediately following this analysis, the court stated that

[i]t would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution impels the states to refrain from adhering to the federal guidelines.

*Sudomir v. McMahon,* 767 F.2d 1456, 1466 (9th Cir.1985). Appellants in the present case point to this language, in their brief, to support their position. As we have noted, however, the court in *Sudomir* addressed the circumstance where the federal law *required* the exclusion of the alien sub-class in question.

**21.** In further support of its conclusion, the Ninth Circuit relied on *Monmouth Medical Center v. Hau Kwok,* 183 N.J.Super. 494, 444 A.2d 610 (1982), which it noted "[upheld a] state regulation excluding illegal aliens from coverage of joint federal/state Medicaid program, *where pertinent federal regulations required such exclusion." Sudomir,* 767 F.2d at 1466 (Emphasis added).

**22.** The U.S. Court of Appeals for the Tenth Circuit has viewed more narrowly this uniformity requirement for applying a relaxed scrutiny standard. In *Soskin v. Reinertson,* 353 F.3d 1242, 1256 (10th Cir.2004), the court stated in dicta, see *supra* n. 12 discussing the holding in *Soskin,* that "we reject the argument that the PRWORA's authorization to the states to provide or deny Medicaid benefits to certain aliens runs afoul of the uniformity requirement of the Constitution's Naturalization

employ a strict scrutiny standard of review in our consideration of the State action here that, in effect, discriminated in the provision of State-funded medical assistance benefits based on an alienage classification or sub-classification. *See also Kurti v. Maricopa County*, 201 Ariz. 165, 33 P.3d 499 (Ct.App.2001) (Arizona statute attempting to remove qualified legal aliens from medicaid regardless of amount of time in U.S. is subject to strict scrutiny); Official Opinion No. 96–1, Op. Att'y Gen. of Pa. (1996) (binding opinion held that Pennsylvania statute excluding legal aliens from State-funded medical assistance, after passage of PRWORA, was subject to strict scrutiny review and accordingly unconstitutional). As we noted, *supra*, a statutory classification that is subject to strict scrutiny must be tailored suitably to serve a compelling state interest. The sole reason advanced by Appellants for instituting the budget cut, other than those purportedly borrowed from PRWORA, was to create a cost savings. We conclude, under a strict scrutiny standard, that Appellants have failed to justify their decision to eliminate the funding.[23]

In *Shapiro v. Thompson, supra*, 394 U.S. at 622, 89 S.Ct. at 1324, 22 L.Ed.2d at 608, the Supreme Court held unconstitutional a State or District of Columbia statutory provision denying welfare assistance to residents of the State or District who had not resided within their jurisdictions for at least one year immediately preceding their applications for such assistance. The governmental appellants, in *Shapiro*, "justif[ied] the waiting-period requirement as a protective device to preserve the fiscal integrity of state public assistance programs." *Shapiro*, 394 U.S. at 627, 89 S.Ct. at 1328, 22 L.Ed.2d at 611.

---

Clause." Examining *Graham*, the court in *Soskin* concluded that, because "Congressional power over aliens derives from more than just the Naturalization Clause," the "uniformity requirement is imposed only on a 'Rule of Naturalization.'" *Soskin*, 353 F.3d at 1256. We, however, do not view the requirement so narrowly.

**23.** Additionally, we do not find the reasons provided in PRWORA to justify denying eligibility for federal benefits (promoting self-sufficiency and discouraging illegal aliens) to meet the strict scrutiny standard of review applied to the State's action in the present case.

The Court rejected this funding justification, under strict scrutiny analysis, stating that

> [w]e recognize that a State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens. It could not, for example, reduce expenditures for education by barring indigent children from its schools. Similarly, in the cases before us, appellants must do more than show that denying welfare benefits to new residents saves money. The savings of welfare costs cannot justify an otherwise invidious classification.

*Shapiro*, 394 U.S. at 633, 89 S.Ct. at 1330, 22 L.Ed.2d at 614 (Footnote omitted). *See also Graham*, 403 U.S. at 376, 91 S.Ct. at 1854, 29 L.Ed.2d at 544 (noting that "the justification of limiting expenses is particularly inappropriate and unreasonable when the discriminated class consists of aliens") (Citation omitted) (Internal quotations omitted). Although *Shapiro* was assessing the right to travel in its equal protection analysis, this distinction does not make less compelling for our analytical purposes the Court's conclusion that preserving the fiscal integrity of a State benefits program is not, by itself, a sufficient basis to satisfy strict scrutiny review. Accordingly, we agree with the Circuit Court that Appellees demonstrated a likelihood of succeeding on the merits of their equal protection challenge under Article 24.

■ With respect to the remaining three factors to be considered in acting on a preliminary injunction request, we conclude that the Circuit Court did not abuse its discretion in resolving them in favor of Appellees. First, considering Appellees' personal interests and the burden to the State, the trial court determined that the relative cost to Appellees of searching for other medical coverage was substantial, but the cost to the State to maintain the cancelled program was relatively minimal. The balance of convenience, it was concluded, favored Appellees. Second, Appellees provided suffi-

cient factual averments, if proven at trial, of their on-going medical needs and inability to obtain alternative health care, without State assistance, for the Circuit Court to find reasonably that Appellees likely would suffer irreparable injury unless the requested preliminary injunction was issued. Third, in light of the public policy goals of the Welfare Innovation Act, the Circuit Court did not abuse its discretion in concluding that the public interest was best served by requiring the State to provide benefits to "some of the most vulnerable segments of its population." Consequently, the Circuit Court generally acted within the permissible range of its discretion in deciding to grant preliminary injunctive relief in favor of Appellees.

V.

■■ We consider next whether the court properly ordered Appellants to reinstate medical benefits to Appellees, as prescribed under the Medical Assistance Program. The Circuit Court's order of 12 January 2006 provided that the medical benefits be reinstated as of 1 July 2005. Additionally, the Circuit Court ordered that the medical benefits be reinstated prospectively from 26 October 2005, the date the original Complaint and Motion for Preliminary Injunction were filed, until final disposition of the case.

■■ As we have noted previously, "injunctive relief is a preventive and protective remedy, *aimed at future acts,* and is not intended to redress past wrongs." *El Bey v. Moorish Science Temple,* 362 Md. 339, 353, 765 A.2d 132, 139 (2001) (citing *Colandrea v. Wilde Lake Community Ass'n, Inc.,* 361 Md. 371, 394, 761 A.2d 899, 911 (2000), which quoted *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 58, 703 A.2d 1338, 1342–43 (1998)) (Internal quotations omitted). Moreover, a preliminary injunction is designed to " 'preserve the court's ability to render a meaningful decision on the merits' " by sustaining the status quo. *State Dep't v. Baltimore County,* 281 Md. 548, 558–59, 383 A.2d 51, 57 (1977) (quoting *Canal Authority v. Callaway,* 489 F.2d 567, 576 (5th

Cir.1974), and *Wieck v. Sterenbuch*, 350 A.2d 384, 387–88 (D.C.1976)). *See also Harford Co. Educ. Ass'n v. Board*, 281 Md. 574, 585, 380 A.2d 1041, 1048 (1977) ("[I]t is fundamental that a preliminary injunction does not issue as a matter of right, but only where it is necessary in order to preserve the *status quo.*") (Internal quotation and citation omitted); *Maloof v. Dep't of Environment*, 136 Md.App. 682, 693, 767 A.2d 372, 378 (2001).[24] "The status quo to be preserved by a preliminary injunction ordinarily has been described as the last, actual, peaceable, noncontested status which preceded the pending controversy." *State Dep't v. Baltimore County*, 281 Md. at 556 n. 9, 383 A.2d at 56 n. 9 (Internal quotation and citation omitted).

We conclude that the Circuit Court's order for retrospective relief through a preliminary injunction was not appropriate. Here, the court's order for retrospective reinstatement of medical assistance benefits was not a preservation of the status quo. Rather, it was, in effect, an award of past damages to Appellees. Damages, if any, may be awarded only upon disposition of the case upon the merits, not through the grant of a preliminary injunction. In the present case, the

---

**24.** As we stated in *State Department v. Baltimore County*, 281 Md. 548, 558, 383 A.2d 51, 57 (1977):

[I]t is quite clear from our cases that a preliminary injunction will lie when it is necessary to preserve the status quo. *Tyler v. Secretary of State*, 230 Md. 18, 20, 185 A.2d 385, 386 (1962); *Dolan v. Motion Picture Etc. Union*, 206 Md. 256, 258–260, 111 A.2d 462, 463 (1955) (in suit to enjoin union from expelling plaintiffs, alleging threat of loss of jobs and other property rights, chancellor should have issued a preliminary injunction pending a decision on his own jurisdiction in order to preserve status quo); *Kahl v. Con. Gas, El. Lt. & Power Co.*, 189 Md. 655, 658, 57 A.2d 331, 332–33 (1948) (no abuse in refusing preliminary injunction in view of defendant's stipulation and agreement to maintain the status quo); *Martin v. United States Wkrs. Ass'n*, 189 Md. 383, 388, 56 A.2d 28, 30 (1947) (order refusing to dissolve injunction reversed for lack of indispensable party; effect of injunction was to change the status quo by assisting the plaintiff to gain possession of assets belonging not to defendants but to a party not before the court); 43 C.J.S. *Injunctions* § 2, at 406 (1945) (sole object of preliminary injunction is to preserve subject in controversy in its then existing condition and to prevent any act whereby right in controversy may be materially injured or endangered).

Circuit Court effectively awarded damages to Appellees in the form of undetermined retrospective medical assistance benefits without either a final adjudication on the merits of liability or a determination of actual damages, if any, suffered by Appellees. *See Benson v. State,* 389 Md. 615, 631, 887 A.2d 525, 534 (2005). We vacate that part of the Circuit Court's order reinstating medical benefits to Appellees, as prescribed under the Medical Assistance Program, retrospectively from 26 October 2005 (the date suit was filed) back to 1 July 2005. We affirm, however, that portion of the Circuit Court's order which compels medical benefits to Appellees, as prescribed under the Medical Assistance Program, prospectively from 26 October 2005, the date the original Complaint and Motion for Preliminary Injunction were filed, until final disposition. As noted, *supra,* Appellees satisfied the four requisite factors for issuance of a preliminary injunction. Because this relief is designed to preserve the status quo from future acts so as not to undermine the final disposition of the case on the merits, the portion of the Circuit Court's order that enjoins affirmatively and prospectively Appellants to provide medical assistance benefits to Appellees shall stand.

Appellants contend that the court lacks the authority to order the executive and legislature branches prospectively to reinstate medical assistance benefits to Appellees. Appellants arguments are misplaced. First, Appellants characterize the Circuit Court's order as an illegal appropriation of funds. While Appellants note correctly that Article III §§ 32 and 52 of the Maryland Constitution provide a comprehensive executive budgetary procedure for appropriating monies, the order prospectively reinstating medical benefits to Appellees in the present case does not operate as an order directing the appropriation of specific funds.[25] Rather, the order serves as

---

**25.** *Maryland Action for Foster Children v. State,* 279 Md. 133, 367 A.2d 491 (1977), is not helpful to Appellants' cause. In *Foster Child.,* we concluded that a statute requiring equal funding levels to parents of foster children was not an appropriation because it did "not purport to appropriate money out of the State Treasury or direct the Comptroller, Treasurer, or anyone else to make payments of money." *Foster Child.,*

a judicial determination that Appellants' action warranted the issuance of a preliminary injunction because there is a likelihood that Appellants' action was unconstitutional.

 Second, Appellants argue that the Declaration of Rights does not overbear the express terms of the Constitution. If there were a conflict between Article 24 and the budget provisions of the Constitution, the more specific budget provisions would prevail. It is unclear to us why Appellants advance this argument when no issue has been presented that questions the validity of the budget and appropriations provisions of the Maryland Constitution. Assuming, as we do, that Appellants actually mean to argue that the equal protection guarantees of Article 24 do not apply to the budget appropriation process, we reject the argument because the executive and legislative budget authority is subject to the constitutional limitations of the Declaration of Rights. *See, e.g., Judy,* 331 Md. at 266, 627 A.2d at 1053 (applying a standard of review to a governor's reduction to a budget appropriation that examined whether the governor and an executive board acted within their legal boundaries). Indeed, to hold otherwise would create a "legal" means for State government to employ invidious classifications that violate the equal protection guarantees of the Maryland Declaration of Rights (as well as other constitutional guarantees) by adopting budgets rather than by enacting laws, which we have long recognized is subject to constitutional constraints.

Third, and related to their second argument, Appellants contend that by providing expressly that the prohibition against unappropriated expenditures applies to "any order,"

279 Md. at 139, 367 A.2d at 494. We found that same statute did not require the Governor to fund payments to foster child parents at a particular level because to do so would frustrate Article III, § 52 where the funding level at issue was at the discretion of the Governor, and not bound by a constitutional duty. *Foster Child.,* 279 Md. at 148–53, 367 A.2d at 499–502. In contrast, the order here is a judicial determination that a State action is likely a violation of Article 24 of the Constitution, and thus it is appropriate to order that the status quo of the controversy be reinstated prospectively.

Article III, § 32 invalidates the Circuit Court's preliminary injunction. Article III, § 32, however, pertains to legislative orders for the appropriation of funds. *Dorsey,* 178 Md. at 237, 13 A.2d at 634 (stating that the effect of Article III, § 32 is to "exclude a legislative order or resolution from the category of an appropriation within the meaning of the provision"); *Baltimore v. O'Conor,* 147 Md. 639, 644, 128 A. 759, 761 (1925) (stating the purpose of the Budget Amendments was to remedy the uncorrelated system in which the General Assembly caused deficits). Article III, § 32 does not pertain to a court's preliminary injunction order that enjoins affirmatively and prospectively Appellants to provide medical assistance benefits to Appellees until the disposition of the merits of the case; nor would Article III, § 32 apply to a court order to remedy a constitutional violation. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLANTS.

Judges WILNER and CATHELL join in the judgment only.