978 A.2d 702

LONACONING TRAP CLUB, INC.

v.

MARYLAND DEPARTMENT OF The ENVIRONMENT.

No. 139, Sept. Term, 2008.

Court of Appeals of Maryland.

Aug. 26, 2009.

328

Jason C. Buckel (S. Ramani Pillai, Buckel & Levasseur, Cumberland), on brief, for Petitioner.

Matthew Zimmerman, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen.), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

If a tree falls in the forest and no one is around to hear it, does it make a sound?[1] An existentialist likely would decline to confront the riddle because human impact expressly is excluded by the query.[2] No philosophers they, the Maryland Department of the Environment, however, apparently would entertain something approaching the obverse of the question: If firearms are fired in a rural area of Allegany County before 1 January 2005, some neighbors complain, and the noise exceeds the relevant prevailing ambient noise standards, why can't we regulate the loudness of the sound? Supplying an answer to this admittedly unphilosophical question is our task in this case.

Maryland Code (2007 Repl.Vol.), Environment Article, § 3–401(c),[3] in relevant part, limits the authority of the Maryland Department of the Environment ("MDE") to adopt "noise control rules and regulations [that] . . . prohibit trapshooting, skeetshooting, or other target shooting between the hours of 9 a.m. and 10 p.m." in certain counties. In 2005, the General Assembly added paragraph (6) to § 3–401(c), exempting from such regulations "shooting sports clubs" in Allegany, Anne Arundel, Garrett, and Washington counties, provided the clubs were "chartered and in operation as of January 1, 2005." The Legislature, however, created an exclusion to the exemption, allowing MDE to continue enforcing noise control regulations

---

1. The original of this venerable philosophical riddle is attributed by some to the 18th Century Irish philosopher, George Berkeley (1685–1753), a sponsor of the concept of "immaterialism" or "subjective idealism."

2. Most existentialists treat the human subject as the starting point for philosophical thought. Thus, this riddle likely would be deemed by them to be too abstract and remote from the concrete human experience to be worthy of serious contemplation.

3. Unless otherwise provided, all statutory references are to Maryland Code (2007 Repl.Vol.), Environment Article. The operative facts of this case concern paragraph (6) of § 3–401(c), which was added to the statute in 2005. The statutory language at issue has not changed since its adoption.

on clubs that the agency "determines were not in compliance [with existing MDE regulations] as of January 1, 2005."

Petitioner, Lonaconing Trap Club, Inc. ("Lonaconing"), is a shooting sports club in Allegany County that has existed as such for over 40 years. As of 1 January 2005, however, it was determined not to be compliant with an existing MDE noise regulation prohibiting human-initiated activity that causes sounds greater than 60 decibels to be heard on adjacent residential property during daylight hours.[4] Lonaconing here challenges a judgment of the Circuit Court for Allegany County enjoining the club from trapshooting on its property until it complies with that regulation. The club claims that § 3–401(c)(6) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights by distinguishing arbitrarily between shooting sports clubs in different counties and by discriminating arbitrarily against clubs that MDE determines were not compliant with the agency's regulations as of 1 January 2005. For reasons we shall explain, we hold that § 3–401(c)(6) does not run afoul of the club's Federal or State constitutional rights to equal protection.

## I.

Lonaconing operates on a 2.8 acre lot on Water Station Road in a rural area of Allegany County. Its property has been used in some capacity as a shooting range since the 1930s. Lonaconing, formed in 1968, began a summer shooting league in 1970; the club incorporated in 1972. According to the record, it has approximately eighty members, 30 of whom

---

4. COMAR 26.02.03.03A(1) provides, with limited exceptions not applicable here, "[a] person may not cause or permit the emission of prominent discrete tones and periodic noises which exceed a level which is 5 dBA lower than the applicable level listed in Table 2." "Table 2" provides a daytime limit of 65 "dBA" on residential property (dBA refers to decibels as measured using a specific technique called "A-weighting"). COMAR 26.02.03.03D(2) provides that "[t]he measurement of noise levels shall be conducted at points on or within the property line of the receiving property."

participate in a shooting league at the club. Lonaconing's shooting schedule has remained more or less the same since 1968. During its twenty-two week annual shooting season, lasting from April to September, club members engage in trapshooting[5] on Tuesdays and Thursdays from 4:30 p.m. to 8:00 p.m. and Saturdays from 10:00 a.m. to 12:00 p.m.[6]

MDE is the State agency responsible for enforcing, among other things, environmental noise standards, sound level limits, and noise control rules.[7] In 2003, Frances Nolan and Patricia Russell, whose residences are on properties adjacent to Lonaconing's, complained to MDE about the noise generated by Lonaconing's shooting activities.[8] In April 2003, pursuant to the complaints, David Jarinko, the agency's noise control and acoustic enforcement specialist, conducted tests to

---

**5.** Trapshooting is the practice of shooting clay "pigeons," typically using twelve gauge shotguns, from a series of set shooting positions. The sport and its terminology originated in the 18th century practice of hunting passenger pigeons. Due to the dwindling and eventual extinction of passenger pigeon flocks, the sport adopted the use of clay, rather than live, "pigeons" in the late 19th century. Lonaconing used approximately 5000 clay "pigeons" per week during its 22–week season in 2004.

**6.** There was some testimony before the Circuit Court, however, that shooting on Saturday lasted occasionally until 2:00 or 3:00 p.m.

**7.** *See* § 3–401(a).

**8.** Lonaconing was operating as a shooting sports club when Russell and Nolan moved to adjacent properties in 1973 and 1983, respectively. Nolan testified that "in the mid 80s" she complained to the Allegany County Board of Commissioners about the noise produced by the club. Russell also testified that she complained to local authorities, to no avail, for almost twenty years before deciding to contact MDE. She stated that she first complained to the club about the noise in 1985. In 1990, she presented to the Allegany County Board of Commissioners a petition signed by 30 area residents who also were disgruntled with the noise from Lonaconing. Lonaconing averred that the 2003 complaints to MDE were Nolan's way of retaliating against the club because she believed that the club complained to the State Department of Natural Resources about her father harvesting ginseng out of season, prompting that agency to commence an investigation of those allegations. The club elicited testimony from an acquaintance of Nolan, who stated that Nolan had no problems with the club until her father was investigated.

measure the sound levels heard on Nolan's property during Lonaconing's regularly scheduled shooting activities. Measuring from her property boundary (which is approximately 300 feet from Lonaconing's firing line) for a duration of fifteen minutes, Jarinko determined that the received gunshot sounds generally were eighty decibels or higher. MDE regulations prohibit sounds that register higher than 60 decibels on adjoining residential property. Approximately two months later, Jarinko's supervisor, George Harman, conducted additional sound measurements with comparable results.

Harman visited with Lonaconing's leadership on 26 June 2003 and presented the agency's test results to the club's President, Edward Evans. Harman explained that Lonaconing's shooting activities exceeded the permitted decibel limitation and that the club was subject potentially to fines. Following the meeting, Harman sent a letter, dated 27 June 2003, to Evans conveying MDE's desire to work with the club towards an amiable solution. Lonaconing continued its shooting activities, prompting more complaints to MDE from Nolan and Russell. Over the next year and a half, MDE and Lonaconing attempted to resolve the matter, but were unable to do so.[9] Accordingly, on 10 November 2004, Harman sent another letter to Evans reiterating that Lonaconing was exceeding

---

**9.** Harman testified at trial that MDE hired Dr. Lauren Abrahamson, of The Johns Hopkins University, to moderate discussions between MDE and Lonaconing. Harman said that MDE resolved all past alleged COMAR noise violations with other violators around the State without the need for litigation. He expressed hope for the same result from his meetings with Lonaconing. The parties discussed possible mitigation efforts on the part of the club, such as a reduction in shooting volume and the creation of "berms" or other barriers that potentially could reduce the noise. Harman testified that his department discussed with the Department of Natural Resources, as well as MDE's Mining Program, the possibility of relocating the club to abandoned mine sites or other potentially free public land. Evans testified that Lonaconing planted several trees, based in part on the advice of the National Rifle Association, but that the trees were burned with gasoline by an unknown party. Harman responded that planting trees would not have been an adequate sound mitigation measure. The club did not avail itself of the possibility of free government land for relocation. Further, Evans indicated that his understanding of zoning laws precluded the possibility of erecting straw bales for mitigation of the sounds.

permitted decibel limitations and informing him that the club had until 29 November 2004 to achieve compliance or submit a plan for becoming compliant. The letter further warned that MDE would initiate an enforcement action against Lonaconing if any shooting activity occurred on club property after 29 November 2004, unless the club had an MDE-approved plan for compliance. Presumably due to Harman's letter, Lonaconing ceased its shooting activities in December 2004. In March 2005, Harman sent yet another letter to Evans, reiterating MDE's willingness to work with Lonaconing to develop a plan for compliance.

Meanwhile, during the 2005 legislative session in Annapolis, the General Assembly enacted chapter 394, 2005 Md. Laws 1834–37, which, in main part, exempted existing shooting sports clubs in Allegany, Anne Arundel, Garrett, and Washington counties from noise control regulations prohibiting trapshooting and other forms of target shooting. The General Assembly, however, chose not to extend the exemption to clubs that MDE determined were not "in compliance" as of 1 January 2005 with existing MDE regulations. Chapter 394, 2005 Md. Laws 1834–37, is codified as § 3–401(c)(6).[10]

In April 2005, Lonaconing resumed its regularly scheduled shooting activities. One month later, MDE conducted additional sound measurements on the Nolan and Russell properties. Each test yielded results exceeding 80 decibels. That same day, the agency initiated against Lonaconing an action in the Circuit Court for Allegany County, seeking civil penalties and an injunction prohibiting Lonaconing from engaging in shooting activities on its property until it complied with the 60 decibel limitation established in the regulations.

At the evidentiary hearing in the trial court, Dr. George Lutz testified for MDE as an expert witness in the fields of psychology and sound management. Dr. Lutz stated that he

---

10. Chapter 394, 2005 Md. Laws 1834–37 also limited the ability of the local governments in Allegany, Anne Arundel, Garrett, and Washington counties to implement local ordinances or regulations prohibiting "trapshooting, skeetshooting, or other target shooting between the hours of 9 a.m. and 10 p.m." *See* § 3–105(a)(4).

authored the noise control guidelines adopted by the U.S. Army for its small arms ranges. He explained that variables affecting the measured/perceived sound of gunfire (such as temperature, humidity, wind, and barometric pressure) are negligible at a distance as small as four hundred feet. Thus, in his opinion, the sounds of gunshots emanating from Lonaconing's property consistently will generate sound levels greater than eighty decibels on Nolan's and Russell's properties.[11]

Lonaconing denied that its shooting activities exceed the permitted decibel level, averring that COMAR fails to provide a standard for measuring decibel levels. The club also made two alternative arguments. First, it claimed that it need not comply with existing MDE regulations, in any event, because the recently enacted addition of § 3–401(c)(6) abrogated them and required MDE to promulgate new, prospective regulations, something MDE did not do. Second, the club asserted that § 3–401(c)(6)(ii) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights by distinguishing arbitrarily between shooting sports clubs in different counties and by discriminating against clubs that the MDE determines were not compliant with the agency's regulations as of 1 January 2005.

On 27 January 2006, the Circuit Court rendered an opinion and order fining Lonaconing $1,000 for the recorded violations on 26 May 2005, and enjoining it from further shooting activities on its property until it "become[s] compliant with sound level limits and noise control rules and regulations of this State." The court found that Lonaconing "exceeded permissible noise levels while conducting its skeet [sic][12]

---

11. Dr. Lutz also explained that there is a relationship between the rise in decibel level and the perceived loudness of a sound. For every ten decibel increase, the sound is perceived to be twice as loud.

12. As noted previously, Lonaconing is a trap shooting club. Skeet shooting and trap shooting differ primarily in the number of shooting "stations" and the rate at which the "pigeons" are targeted.

shooting activities," noting that MDE employed the same instruments and methodology that it uses when investigating other noise complaints and that the results obtained were consistent with the sound levels generally produced by gunshots fired at the distances at issue. The court rejected Lonaconing's argument that there is no standard governing the measurement of sound levels, reasoning that COMAR provides the applicable standard by setting "60 dbA" as the maximum sound level permitted on residential property, and observing that "dbA" is defined as "an abbreviation for the sound level in decibels determined by [the] A-weighting network of a sound level meter or by calculation from octave band or one-third octave band data." [13] Because the measurements taken by Jarinko and Harman were A-weighted, the court held that they complied with the standard mandated by CO-MAR.

The Circuit Court also rejected Lonaconing's argument that § 3–401(c)(6)(ii) required MDE to promulgate new, prospective regulations after 1 January 2005 to govern sound levels produced by the club's shooting activities. According to the court, a shooting sports club's compliance with existing regulations may be determined only by reference to pre-existing, continuing regulations. Thus, the court reasoned that determining non-compliance based on the existing regulations, while requiring a new set of regulations to pursue enforcement against a non-compliant club, would be an absurd interpretation § 3–401(c)(6)(ii). With respect to Lonaconing's equal protection challenge, the court held that the club failed to show that the distinctions complained of were arbitrary or irrational.

Lonaconing noted a timely appeal to the Court of Special Appeals, which affirmed the trial court judgment in an unreported opinion. This Court granted the club's Petition for a Writ of Certiorari to consider the following: (1) Whether adoption of § 3–401(c)(6)(ii) required MDE to adopt new,

13. *See* COMAR 26.02.03.01(B)(6).

prospective noise control regulations in order to prohibit shooting activity by clubs that the agency deems not compliant as of 1 January 2005 with pre-existing regulations? and, (2) Whether § 3–401(c)(6)(ii) violates the equal protection guarantees of the Federal and State constitutions? *Lonaconing Trap Club, Inc. v. Md. Dep't of Env't*, 406 Md. 743, 962 A.2d 370 (2008).

## II.

Pursuant to § 3–401(a), MDE "shall adopt environmental noise standards, sound level limits, and noise control rules and regulations as necessary to protect the public health, the general welfare, and property." In delegating this authority to MDE, the Legislature limited the agency's power to prohibit certain "shooting sport" activities in enumerated counties. Before the 2005 legislative session, the General Assembly did so in § 3–401(c)(5). That section provides:

(i) The sound level limits and noise control rules and regulations adopted under this subsection may not prohibit trapshooting, skeetshooting, or other target shooting between the hours of 9 a.m. and 10 p.m. on any range or other property of a shooting sports club that is chartered and in operation as of January 1, 2001.

(ii) This paragraph does not apply in Allegany, Anne Arundel, Baltimore City, Calvert, Charles, Garrett, Howard, Montgomery, St. Mary's and Washington Counties.

Pursuant to its statutory grant of authority, MDE promulgated several regulations establishing sound limits, including COMAR 26.02.03.03(A)(3), which prohibits "the emission of prominent discrete tones and periodic noises" that exceed 60 decibels on receiving residential property during daytime hours.

In 2005, the Legislature added § 3–401(c)(6) to the Environment Article, exempting from MDE noise regulations shooting sports clubs in certain counties not exempted previously by § 3–401(c)(5). The new section provides:

(6)(i) Except as provided in subparagraph (ii) of this paragraph, [MDE] may not adopt sound level limits and noise control rules and regulations under this subsection that prohibit trapshooting, skeetshooting, or other target shooting between the house of 9 a.m. and 10 p.m. in Allegany County, Anne Arundel County, Garrett County, or Washington County on any range or other property of a shooting sports club that is chartered and in operation as of January 1, 2005.

(ii)1. Subject to the provisions of subsubparagraph 2 of this subparagraph, [MDE] may adopt sound level limits and noise control rules and regulations under this subsection that prohibit trapshooting, skeetshooting, or other target shooting between the hours of 9 a.m. and 10 p.m. in Allegany County, Anne Arundel County, Garrett County, or Washington County on any range or other property of a shooting club that [MDE] determines is not in compliance as of January 1, 2005 with environmental noise standards, sound level limits, or noise control rules and regulations adopted under this title.

2. A sound level limit or noise control rule or regulation adopted under this subsection shall allow trapshooting, skeetshooting, and other target shooting between the hours of 9 a.m. and 10 p.m. by a shooting sports club that [MDE] determines has become compliant with sound level limits and noise control rules and regulations adopted under this title.

Lonaconing asserts that the MDE regulations in existence on and before 1 January 2005, with which the Circuit Court directed the club to comply, no longer applied to the club after 1 January 2005. It contends that, by enacting § 3–401(c)(6)(ii) 1 in 2005, which provides that MDE "may adopt" noise control regulations, the General Assembly intended to abrogate the earlier noise control regulations. This is not a fair reading of the statute.

 " 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature.' " *Bd. of*

*Ed. v. Zimmer–Rubert,* 409 Md. 200, 214, 973 A.2d 233, 241 (2009) (quoting *Kushell v. Dep't of Natural Resources,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005)). This Court reads the statute as a whole to ensure that none of its provisions are rendered meaningless. *Property & Cas. Ins. Guar. Corp. v. Yanni,* 397 Md. 474, 481, 919 A.2d 1, 5 (2007). " '[We] neither add nor delete language so as to reflect an intent not evidenced in the plain language of the statute; nor [do we] construe the statute with forced or subtle interpretations that limit or extend its application.' " *United States v. Ambrose,* 403 Md. 425, 439, 942 A.2d 755, 763 (2008) (quoting *Kushell,* 385 Md. at 576–77, 870 A.2d at 193). Additionally, " '[w]e avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.' " *Zimmer–Rubert,* 409 Md. at 215, 973 A.2d at 242 (quoting *Walzer v. Osborne,* 395 Md. 563, 573, 911 A.2d 427, 432 (2006)).

The interpretation of § 3–401(c)(6)(ii) 1 advanced by Lonaconing is unreasonable for at least two reasons. First, through § 3–401(a), the General Assembly granted MDE the power to "adopt environmental noise standards, sound limits, and noise control rules and regulations." Thus, because MDE's power to promulgate noise control regulations stems from § 3–401(a), which existed prior to the Legislature's adoption of § 3–401(c)(6), the latter section is viewed properly as a new limitation on MDE's already existing rulemaking authority. The 2005 statute is not, as Lonaconing suggests, a wholly new grant of authority that requires MDE to promulgate new regulations in order to exercise its enforcement power. Second, it would be illogical for the General Assembly to demand that MDE re-enact its noise control regulations (or enact different regulations), when the agency's regulations existing as of 1 January 2005 provide the standard for determining a club's non-compliant status.

■ Accordingly, we hold that the 60 decibel sound limit required by MDE regulation prior to and on 1 January 2005 continues to apply to shooting sports clubs, such as Lonacon-

ing, that are excluded from § 3–401(c)(6)(i)'s general exemption for existing clubs in the applicable counties.

## III.

Lonaconing places most of its emphasis on its argument that § 3–401(c)(6)(ii) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution [14] and Article 24 of the Maryland Declaration of Rights.[15] It contends that there is no rational basis for "allowing ... trapshooting in the majority of the State, or indeed everywhere else in Allegany County except the [Lonaconing] range, but prohibiting [Lonaconing] from operating as it had for over thirty years."

In *Conaway v. Deane*, 401 Md. 219, 932 A.2d 571 (2007),[16] this Court reiterated the three general standards that courts employ when analyzing equal protection challenges. We observed:

---

**14.** The Fourteenth Amendment provides, in relevant part, "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

**15.** Article 24 provides

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

While the Maryland Constitution does not contain an express equal protection clause, this Court has said that "the concept of equal protection [] is embodied in Article 24." *State v. Good Samaritan Hosp.*, 299 Md. 310, 327 n. 7, 473 A.2d 892, 900 n. 7 (1984).

**16.** Although *Deane* involved an equal protection claim brought pursuant to Article 24 only, we observed previously, that "we generally apply [Article 24 and the Equal Protection Clause of the Fourteenth Amendment] in a like manner and to the same extent." *See Ehrlich v. Perez*, 394 Md. 691, 715, 908 A.2d 1220, 1234 (2006). While the two provisions "are capable of divergent application," Lonaconing does not suggest that it receives broader protection under one than under the other. *See id.* Thus, in resolving this case, we shall not distinguish between the Equal Protection Clause of the Fourteenth Amendment and Article 24.

"[T]he top tier of [constitutional] review contemplates that when a statute creates a distinction based upon clearly 'suspect' criteria, or when that enactment infringes upon personal rights or interests deemed to be 'fundamental,' then the legislative product must withstand a rigorous, 'strict scrutiny.'" When utilizing this most-demanding standard of constitutional review, we deem unconstitutional a challenged legislative classification unless the distinction formed by it is "necessary to promote a compelling government interest."

. . . .

In contrast, we generally employ the least exacting and most deferential standard of constitutional review when the legislative action under review neither interferes significantly with a fundamental right nor implicates a suspect classification. Under this "rational basis" level of scrutiny, the classification will pass constitutional muster so long as it is "rationally related to a legitimate governmental interest." In other words, we will uphold the statute under rational basis review "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational." Statutes reviewed pursuant to this level of scrutiny are presumed constitutional, "and will be invalidated only if the classification is clearly arbitrary." "[A] classification [subject to rational basis review] having some reasonable basis need not be made with mathematical nicety and may result in some inequality" so long as the state can produce any conceivable "state of facts" to justify the distinction. A statute subject to rational review often passes constitutional muster.

A third level of review has arisen to leaven the rigid two-tiered constitutional framework by which courts review the constitutionality of government action. A "heightened" level of scrutiny, otherwise known as "intermediate scrutiny," is triggered when the challenged action creates a classification "which ha[s] been subjected to a higher degree of

scrutiny than the traditional and deferential rational basis test, but which ha[s] not [yet] been deemed to involve suspect classes or fundamental rights." This middle-tier scrutiny may be implicated to review a "quasi-suspect" classification. In order to survive this intermediate level of scrutiny, the statute in question "must serve important government objectives and must be substantially related to the achievement of those objectives."

*Deane,* 401 Md. at 272–77, 932 A.2d at 603–05 (first alteration added, internal citations and footnotes omitted).

 Lonaconing concedes that strict scrutiny does not apply here; however, it is unwilling to yield the intermediate scrutiny ground without a fight. To advance its argument for the intermediate scrutiny standard of review, the club argues that it "and its members are prevented from engaging in an otherwise protected and lawful activity, interfering with their liberty interests and economic freedoms, while others similarly situated have no such statutory or regulatory restrictions." This argument is not convincing. Lonaconing does not suggest that shooting sports clubs deemed non-compliant with MDE regulations constitute a suspect or quasi-suspect class. Nor does it contend that classifications based on political subdivisions are suspect or quasi-suspect. *See Dep't of Transp. v. Armacost,* 299 Md. 392, 409, 474 A.2d 191, 199 (1984) ("In reviewing statutory distinctions based on territory, the rational basis test applies because no fundamental right or suspect class is affected."). Additionally, while this Court has indicated its willingness to apply intermediate or heightened scrutiny when reviewing "statutes . . . which affect 'important' personal interests or work a 'significant interference with liberty or a denial of a benefit vital to the individual,'" *see Atty. Gen. of Md. v. Waldron,* 289 Md. 683, 711, 426 A.2d 929, 944 (1981) (quoting LAWRENCE TRIBE, AMERICAN CONSTITUTIONAL LAW 16-3 (1978)), Lonaconing does not explain how its sport shooting qualifies as such a liberty interest or vital benefit. Without an articulated basis for doing so, we shall not apply a heightened standard of review. Thus, rational basis review is the appropriate standard here.

■■ "Under the rational basis test, a statutory classification enjoys a strong presumption of constitutionality," *Armacost,* 299 Md. at 409, 474 A.2d at 200, and "will not be held void if there are any considerations relating to the public welfare by which it can be supported," *Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 48, 300 A.2d 367, 378 (1973). Thus, "[i]t is not necessary [for a reviewing court] to identify the reasons that actually prompted the General Assembly to legislate as it did." *Md. Aggregates Ass'n v. State,* 337 Md. 658, 675, 655 A.2d 886, 894 (1995). Furthermore, "the party attacking [a statutory classification] must show by clear and convincing evidence that it does not rest upon any rational basis but is essentially arbitrary." *Armacost,* 299 Md. at 409, 474 A.2d at 200.

Lonaconing's equal protection challenge fails because the club does not carry its burden of demonstrating that § 3–401(c)(6)(ii) is not related rationally to any legitimate government interest. Lonaconing contends that

MDE has offered no basis, much less a rational one, why [Lonaconing's] shooting activities in 2003, 2004 and pre-July 1, 2005 (which form the predicate for MDE's complaint) were properly subject to noise control regulations while similarly-situated trapshooting and sport shooting clubs and enthusiasts in Frederick, Carroll, Harford, Prince George's, Baltimore and many other counties in Maryland were free to operate without regulatory standards or limits promulgated by MDE during that time period, regardless of citizen complaints. Nor has the State demonstrated how an important government objective of sound or noise control is substantially advanced by limiting trapshooting in one rural area of a largely rural county while allowing it unabated throughout the rest of that county and the majority of the State's political subdivisions.

MDE has simply relied on the latitude afforded by the legislature's prerogative to create such territorial distinctions without offering any rational basis for such a prerogative, and the Court of Special Appeals has abrogated any responsibility to assess the rationality of the subject classifi-

cation under legitimate rational basis or intermediate scrutiny analysis. MDE has presented no evidence of a statutory history reflecting a valid basis for this distinction.

This argument misunderstands the burden under rational basis review. Our cases make clear that Lonaconing must establish § 3–405(c)(6)'s irrationality,[17] something it fails to do on this record.

■ The club claims that the statute violates equal protection guarantees in two ways. First, it asserts that § 3–401(c)(6)(ii) distinguishes arbitrarily between counties with respect to application of sub-subparagraph 1, denying the general exemption (from noise control regulations) to clubs deemed non-compliant as of 1 January 2005. In doing so, the club points out that, under § 3–401(c)(5), similarly situated clubs in most political subdivisions of the State do not have their ability to evade application of noise control regulations determined based on that benchmark. This argument shall not carry the day.

■ Territorial classifications generally are permissible under equal protection analysis. *See Armacost*, 299 Md. at 409, 474 A.2d at 191. The territorial distinction here is no different.[18] As the Supreme Court explained, "[a] state legis-

---

17. *See, e.g., Deane*, 401 Md. at 316, 932 A.2d at 630, *Kane v. Bd. of Appeals*, 390 Md. 145, 173, 887 A.2d 1060, 1076 (2005); *State v. Good Samaritan Hosp. of Md., Inc.*, 299 Md. 310, 328, 473 A.2d 892, 901 (1984).

18. This case is distinguishable from *Verzi v. Balt. County*, 333 Md. 411, 635 A.2d 967 (1994). In that case, we held unconstitutional a Baltimore County ordinance that required a police officer responding to an accident scene in Baltimore County to call a towing operator whose place of business was in Baltimore County, regardless of whether an out-of-county operator was closer to the scene. *Verzi*, 333 Md. at 427, 635 A.2d at 974–75. In doing so, we observed that "[i]n areas of economic regulation ... [we have] been particularly distrustful of classifications which are based solely on geography." *Id.* at 423, 635 A.2d at 973. Such classifications generally do not advance a legitimate government interest, but are intended instead to " 'confer the monopoly of a profitable business upon residents' " of one geographical area to the exclusion of the residents of other areas. *Id.* at 427, 635 A.2d at 974–75 (quoting *Mayor of Havre de Grace v. Johnson*, 143 Md. 601, 608,

lature may itself determine [matters related to the public welfare] for each of its local subdivisions, having in mind the needs of each. Territorial uniformity is not a constitutional requisite." *Salsburg v. Maryland*, 346 U.S. 545, 552, 74 S.Ct. 280, 284, 98 L.Ed. 281, 288 (1954) (upholding statute that limited, in certain counties, the application of the Exclusionary Rule for evidence seized in violation of the Fourth Amendment)[19]; *see also Supermarkets Gen'l Corp. v. State*, 286 Md. 611, 622, 409 A.2d 250, 256 (1979) (upholding statute that required retail stores in certain counties to close on Sundays). Here, the relevant statutory history reflects that the Allegany County delegation in the Maryland House of Delegates unanimously supported House Bill 756, which became § 3–401(c)(6). Moreover, the State Senator representing Allegany, Garrett, and Washington counties sponsored the Senate version of the bill, Senate Bill 685, and the Allegany County Board of Commissioners unanimously endorsed the Senate bill. The Board of Commissioners also sent a letter to the Chairman of the Senate Committee on Education, Health, and Environmental Affairs, urging that committee to support the bill as well. Thus, on the record before us, the General Assembly's passage of § 3–401(c)(6) is related rationally to its legitimate interest in promoting local preferences.

■■■ Second, Lonaconing maintains that denying the general exemption to clubs, within Allegany County (or any other county covered by § 3–401(c)(6)), deemed not in compliance with existing regulations creates an unconstitutional classification because other clubs in the county, which were not deemed

---

123 A. 65, 67 (1923)). The instant case, however, concerns environmental, not economic, regulation. We noted, in *Verzi*, that territorial classifications, established for reasons besides economic favoritism, ordinarily survive rational basis review, even if they have an incidental economic effect. *Id.* at 421, 635 A.2d at 972.

19. In *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081, 1090 (1961), however, the Supreme Court held that, in any state court proceeding, the Due Process Clause of the Fourteenth Amendment prohibits the admission of evidence seized in violation of the Fourth Amendment.

non-compliant, now may produce with impunity gunshot sounds that register, on neighboring residential properties, the same as or louder than the sounds generated by Lonaconing's shooting activities, while Lonaconing must develop (and pay for) a means of reducing the sounds produced by its activities. This argument also is unavailing.

 "Underinclusiveness does not create an equal protection violation under the rational basis test." *Armacost*, 299 Md. at 409, 474 A.2d at 199. The constitution does not demand that the Legislature " 'strike at all evils at the same time or in the same way.' " *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659, 670 (1981) (quoting *Semler v. Or. Bd. of Dental Examiners*, 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086, 1089 (1935)). To be sure, the General Assembly has a legitimate interest in protecting the citizenry of the counties covered by § 3–401(c)(6) from offensive or dangerous levels of noise. While § 3–401(c)(6)(ii) does not eliminate all gunshot noise louder than 60 decibels on residential property, it allows shooting sports clubs to operate without noise limitations only if they already were not generating offensive or dangerous levels of noise. The Legislature may have presumed that residents, unhappy with current levels of noise, would have contacted MDE previously about suspected violations, causing MDE to deem any such club to be non-compliant. Thus, even though the statute exempts most clubs from noise regulation prohibiting sport shooting, § 3–401(c)(6)(ii) nonetheless advances the legitimate government objective of protecting the citizenry from undue noise. At the same time, § 3–401(c)(6)(i)'s exemption for most existing clubs advances the legitimate State interest in promoting the reasonable expectations of clubs that were complying with existing regulations as of 1 January 2005, by protecting those clubs from increased regulation. *See Nordlinger v. Hahn*, 505 U.S. 1, 13, 112 S.Ct. 2326, 2333, 120 L.Ed.2d 1, 14 (1992) (recognizing legitimate government interest in protecting "reasonable reliance interests" through a property tax system that taxed older homes at a lower rate than new or recently purchased homes). A club,

such as Lonaconing, that was not in compliance as of that date patently has not relied on the pre-existing and continuing MDE noise control regulations. Additionally, the dichotomy created by § 3–401(c)(6) simply may reflect the Legislature's desire to protect the citizenry from undue noise, balanced against its interest in saving the costs associated with continuing to regulate clubs that have not proven themselves to be a source of undue noise in their respective communities.

As evidence that § 3–401(c)(6)(ii) is not related rationally to a legitimate government objective, however, Lonaconing relies principally on a Fiscal and Policy Note prepared by the Department of Legislative Services regarding House Bill 756, which provides that the purpose of § 3–401(c)(6) is to prevent existing shooting sports clubs from being "forced out of business" by increased regulation stemming from citizens' noise complaints. Thus, so Lonaconing's argument proceeds, its exclusion (based on its non-compliant status), from § 3–401(c)(6)(i)'s general exemption for other existing clubs, is not related rationally to the statute's stated objective because Lonaconing effectively is being forced out of business by Nolan's and Russell's complaints to MDE. Lonaconing's logical leap is flawed. As stated, the Fiscal and Policy Note reveals the Legislature's concern over subjecting existing clubs to *increased* regulation. Yet, § 3–401(c)(6)(ii), as written and applied, excludes only clubs that were deemed non-compliant with *existing* regulations. MDE has not sought to subject Lonaconing to more numerous or more stringent noise control regulations than what Lonaconing (and every other existing shooting sports club in the applicable counties) was subject to before the Legislature adopted § 3–401(c)(6) in 2005.

Lonaconing also emphasizes that it is the only shooting sports club affected by § 3–401(c)(6)(ii)'s exclusion of clubs deemed non-compliant as of 1 January 2005. This, however, is not significant in and of itself, even if true. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074 145 L.Ed.2d 1060, 1063 (2000) (noting that "the number of

individuals in a class is immaterial for equal protection analysis"). For Lonaconing to succeed on its equal protection challenge as a "class of one," it "must show that (1)[it] was treated differently from others similarly situated and (2) there was no rational basis for the disparate treatment." *See Stotter v. Univ. of Tex.*, 508 F.3d 812, 823 (5th Cir.2007). As stated previously, Lonaconing does not satisfy its burden to establish that § 3–401(c)(6)(ii) is without a rational basis. Moreover, Lonaconing does not explain how it is treated differently from similarly-situated shooting sports clubs. Clubs opening in the counties governed by § 3–401(c)(6) after 1 January 2005 likewise do not receive the benefit of § 3–401(c)(i)'s general exemption from noise control regulation. Evidence adduced by MDE revealed that an existing club in Anne Arundel County was deemed not in compliance with existing noise control regulations, but since agreed to a plan of compliance with the agency.[20]

Finally, Lonaconing suggests as evidence of irrationality that, if and when it becomes compliant with MDE's existing 60 decibel sound limitation for residential property, § 3–401(c)(6)(ii)2 does not require it to maintain compliance with that limitation for any determinant period of time in order to

---

**20.** Lonaconing stresses that other clubs actually may have been out of compliance with MDE regulations, but now fall with § 3–401(c)(6)(i)'s exemption, only because no one complained about them to MDE and, thus, MDE never deemed them not in compliance. Passive enforcement of a regulation, however, generally does not violate equal protection guarantees unless it "ha[s] a discriminatory effect and [ ] was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 609, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 574, 586 (1985). The constitution does not require the State to seek proactively persons or entities breaking the law. *Id.* Lonaconing does not suggest that MDE discriminated against the club by investigating it and deeming it not in compliance; nor has the club adduced evidence that MDE would have handled differently complaints against another club. Thus, the General Assembly's decision to exclude from § 3–401(c)(6)(i)'s general exemption only clubs that MDE deemed not in compliance as of 1 January 2005 does not deny equal protection to Lonaconing, despite the statute's reliance on MDE's passive enforcement of existing sound level limits. As stated, the General Assembly may have presumed that citizens would have complained about existing clubs that were not complying with the sound level limits.

gain the benefit of § 3–401(c)(6)(i)'s general exemption from noise regulations. Thus, the club postulates that it is irrational to require it to become compliant in the first place. We disagree. As noted previously, the Legislature has legitimate interests in protecting existing clubs' reasonable reliance on existing MDE regulations, while ensuring that clubs are not shooting currently at sound levels found to be excessive by MDE. The statute advances those interests. Any problems that may develop in the future as a result of clubs (including Lonaconing, if and when it becomes compliant) escalating the noise that they produce, due to louder guns or deteriorating sound proofing structures, for example, are matters of legislative concern. The "wisdom or expediency" of the statute in its current form is not a matter for judicial intervention. *Salisbury*, 268 Md. at 48, 300 A.2d at 378.

As we observed in *Supermarkets General Corp. v. State*, 286 Md. 611, 629, 409 A.2d 250, 260 (1979), "[some laws] have been characterized as unwise, complex, a patchwork, a crazy quilt, a labyrinth, a legal maze, unnecessarily befuddling statutory crabgrass, an inconvenience, a hypocrisy. But even were that so, those laws could not for those reasons be voided by the judiciary. As we have indicated, absent some constitutional infirmity the judiciary simply has no power to interfere." Lonaconing's suggestion that § 3–401(c)(6) reveals a "tangled web of statutory history" may be an accurate assessment, but that is not something this court need opine here. Were we the prophesied King of Asia, we might sever § 3–401(c)(6)'s Gordian knot.[21] Under the rational basis standard of review, however, only the Legislature properly possesses that ability.

---

21. According to legend, the Gordian knot was an immense and intractable knot affixed to an ox-cart outside the palace of the Phrygian kings in Gordium. Tradition held that whoever could unravel the knot would become "king of Asia." In 333 BC, Alexander of Macedon and his army wintered in Gordium (in modern Turkey, south of Ankara). The Macedonian king examined the knot and, unable to untie it by hand, severed it with his sword. Proceeding to conquer much of the known Asian world thereafter, he earned the name Alexander the Great. Our aspirations are more mundane.

## IV.

We hold that Lonaconing is subject to the 60 decibel sound limitation for residential property. A plain reading of § 3–401, in its entirety, makes clear that MDE did not need, after 1 January 2005, to promulgate new regulations for clubs, such as Lonaconing, to which § 3–401(c)(6)(i)'s general exemption from noise control regulations does not apply. We also resolve that Lonaconing did not satisfy its burden to establish that the regulatory scheme is not related rationally to a legitimate government interest. For these reasons, the judgments of the trial court and the intermediate appellate court are affirmed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONER.**

BELL, C.J., GREENE and MURPHY, JJ., Dissent.

Dissenting Opinion by MURPHY, J., which BELL, C.J., and GREENE, J., join.

While I recognize that Petitioner has not argued that the legislation at issue is a "special law" prohibited by Section 33 of Article III of the Maryland Constitution, I would decide this issue as "desirable to guide the trial court [as well as] to avoid the expense and delay of another appeal." Maryland Rule 8–131(a).

In *State v. Burning Tree Club,* 315 Md. 254, 554 A.2d 366 (1989), this Court stated:

In *Cities Service Co. v. Governor,* 290 Md. 553, 567, 431 A.2d 663 (1981), this Court examined decisions applying § 33, concluding that "no mechanical rules for deciding cases" exist. Nonetheless, the Court enumerated several factors to be considered in deciding whether a statute is a "special law." The Court reiterated the importance of these factors in *State v. Good Samaritan Hospital,* 299 Md. 310, 473 A.2d 892 (1984). The factors include: whether "the underlying purpose of the legislation is to benefit or burden a particular class member or members"; whether particular

people or entities are identified in the statute; and what "the substance and 'practical effect' " of a statute is and not simply its form. *State v. Good Samaritan Hospital, supra,* 299 Md. at 330, 473 A.2d at 902; *Cities Service Co. v. Governor, supra,* 290 Md. at 569, 431 A.2d at 672–673. Our past decisions have also considered whether particular entities or individuals sought and obtained special advantages under the legislation or if other similar entities or individuals were discriminated against by the legislation. *Cities Service Co., supra,* 290 Md. at 570, 431 A.2d at 673. In deciding whether a law violates § 33 in applying to only certain members of a class, we have looked to whether the statute's distinctions are arbitrary or unreasonable. *Ibid.* Moreover, this Court has held that some enactments were not special laws even though they applied to only a single entity. Such laws are permissible where unique circumstances render the entity a class unto itself, *Cities Service Co., supra,* 290 Md. at 568, 431 A.2d at 672, or where the enactment, although it affects only one entity currently, would apply to other similar entities in the future, *Reyes v. Prince George's County,* 281 Md. 279, 305–306, 380 A.2d 12 (1977); *Potomac Sand & Gravel v. Governor,* 266 Md. 358, 379, 293 A.2d 241 (1972).

*Id.* at 273–74, 554 A.2d at 376.

In the case at bar, the General Assembly has enacted a statute that provides for injunctive relief against Petitioner, and prohibits such relief against every similar entity in Allegany County. It is clear that the enactment at issue (1) has the practical effect of imposing a burden on no entity other than Petitioner, and (2) will *not* apply to other similar entities in the future. Under these circumstances, the injunction should be dissolved on the ground that it is based upon an unconstitutional "special" law.

Moreover, while the General Assembly certainly has the right to enact statutes that allow (or require) the trial judge to impose an enhanced penalty for a second (or subsequent) conviction of driving while impaired by alcohol, and that provide for the imposition of "alcohol restrictions" on motor-

ists who have been convicted of that offense, it would not be rational to conclude that the General Assembly also has the right to enact a statute under which the only persons who can henceforth be convicted of driving while impaired by alcohol are persons who (1) committed that offense in Allegany County, and (2) had previously been convicted of that offense prior to October 1, 2009. I would therefore hold that the enactment also fails the "rational basis" test.

Chief Judge BELL and Judge GREENE have authorized me to state that they join this dissent.